## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BRIAN BARRY, Derivatively on Behalf of COLONY CAPITAL, INC. (F/K/A COLONY NORTHSTAR, INC.), | * | Civil Action No.: |
| | * | **VERIFIED SHAREHOLDER** |
| c/o | * | **DERIVATIVE COMPLAINT** |
| Murphy, Falcon & Murphy | | |
| 1 South Street | * | **DEMAND FOR JURY TRIAL** |
| 23rd Floor, | | |
| Baltimore, Maryland 21202 | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| THOMAS J. BARRACK, JR., RICHARD B. SALTZMAN, DARREN TANGEN, NEALE REDINGTON, DAVID T. HAMAMOTO, DOUGLAS CROCKER II, NANCY A. CURTIN, JON A. FOSHEIM, JUSTIN E. METZ, GEORGE G. C. PARKER, CHARLES W. SCHOENHERR, JOHN A. SOMERS, and JOHN L. STEFFENS | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| c/o | * | |
| COLONY CAPITAL, INC., | | |
| 7 St. Paul Street | * | |
| Suite 820 | | |
| Baltimore, MD 21202 | * | |
| | * | |
| Serve on: | * | |
| CSC-LAWYERS | | |
| INCORPORATING SERVICE | * | |
| 7 St. Paul Street | | |
| Suite 820 | * | |
| Baltimore, Maryland 21202 | | |
| | * | |
| Defendants, | * | |
| | | |
| and | * | |
| | | |
| COLONY CAPITAL, INC. (F/K/A COLONY NORTHSTAR, INC.), | * | |

7 St. Paul Street                          *
Suite 820
Baltimore, Maryland 21202                  *

     Serve on:                            *
     CSC-LAWYERS
     INCORPORATING SERVICE                *
     7 St. Paul Street
     Suite 820                            *
     Baltimore, Maryland 21202
                              *

        Nominal Defendant.           *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Brian Barry ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Colony Capital, Inc. f/k/a Colony NorthStar, Inc. ("Colony NorthStar" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Thomas J. Barrack, Jr., Richard B. Saltzman, Darren Tangen, Neale Redington, David T. Hamamoto, Douglas Crocker II, Nancy A. Curtin, Jon A. Fosheim, Justin E. Metz, George G. C. Parker, Charles W. Schoenherr, John A. Somers, and John L. Steffens (collectively, the "Individual Defendants," and together with Colony NorthStar, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Colony NorthStar, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents,

conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Colony NorthStar, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Colony NorthStar's directors and officers from January 10, 2017 through the present day (the "Relevant Period").

2.     Colony NorthStar, Inc. was created following a three-way merger of Colony Capital, Inc. ("Colony Capital"), Colony NorthStar Asset Management Group Inc. ("NAMG"), and Colony NorthStar Realty Finance Corp. ("NRF"), which was consummated on or about January 10, 2017 (the "Merger").  On June 25, 2018, the Company changed its name from Colony NorthStar, Inc. to Colony Capital, Inc.

3.     Colony NorthStar is a real estate investment trust ("REIT") with an embedded institutional and retail investment management business. The Company divides its business into five core strategic real estate segments: Healthcare, Light Industrial, Hospitality, Other Equity and Debt, and Investment Management.  Colony NorthStar both physically owns real estate and debt instruments secured by mortgages on real estate.

4.     The Merger, through the addition of NAMG, allowed the Company to add a retail investment management business to Colony NorthStar's business, including the fees generated from it.

5.      During the Relevant Period, the Individual Defendants caused the Company to make false and misleading statements that created the impression that the Company's business, operations, and prospects were better than they were, especially with respect to the Merger and the Company's Investment Management and Healthcare segments.

6.      On March 1, 2018, the Company filed its financial results for the year ended December 31, 2017, which announced significant goodwill impairment, including a $375 million goodwill impairment attributed to Colony NorthStar's Investment Management segment. Colony Northstar also announced that its full year 2017 core funds from operation ("Core FFO") was $1.16 per share and that the Company was lowering its dividend from $1.08 per share in 2017 to $0.44 per share in 2018.

7.      On this news, the price per share of Colony NorthStar stock fell more than 22.8%, or $1.78 per share, from the previous day's closing price, closing at $6.00 per share on March 1, 2018.

8.      The Individual Defendants breached their fiduciary duties in making and/or causing the Company to make a series of materially false and misleading statements and omissions of material fact regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's capital fundraising was not accelerating or gaining momentum; (2) the Company's funds would not be able to raise retail funds sufficient to contribute materially to the Company's financial results; (3) the Company was being negatively impacted by new regulations regarding the disclosure of investment management fees, and the effect it had on the collection of fees, to a greater extent than portrayed; (4) the Company's retail investment management business was not substantially contributing to

the Company's target capital fundraising amount; (5) the Company would not meet its Core FFO and dividend guidance; (6) the overall performance of Company, including specifically its Healthcare and Investment Management segments, was weaker than had been reported; and (7) the Company failed to maintain internal controls.

9.     As a result of the foregoing, the Individual Defendants' and Company's public statements were materially false and misleading at all relevant times. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

10.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

11.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while three of them engaged in lucrative insider sales netting proceeds of over $30.5 million. Nearly 23.4 million shares of the Company's common stock were repurchased between March 2017 and December 2017, inclusive, for approximately $300 million. As the Company stock was actually only worth $5.50 per share during that time, the price at closing on March 23, 2018, the Company overpaid approximately $171.5 million in total.

12.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected Colony NorthStar, its former Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its Chief Accounting Officer ("CAO"), and its former Executive Vice Chairman,

to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, losses due to the Company's overpayment of approximately $171.5 million for the repurchases of its own stock and the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company, and will cost the Company going forward many millions of dollars.

13. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested and/or independent directors, a majority of the Colony NorthStar Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

16. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    Venue is proper in this District because the Company is headquartered in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.    Plaintiff is a current shareholder of Colony NorthStar common stock. Plaintiff has continuously held Colony NorthStar common stock at all relevant times.

### Nominal Defendant Colony NorthStar

22.    Colony NorthStar is a Maryland corporation with its principal executive offices at 515 South Flower Street, 44th Floor, Los Angeles, CA 90071. Colony NorthStar stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CLNY."  On June 25, 2018, the Company changed its name from Colony NorthStar, Inc. to Colony Capital, Inc.

### Defendant Saltzman

23.    Defendant Richard B. Saltzman ("Saltzman") served as the Company's President and CEO from the Merger until November 5, 2018 and as a Company director from January 11, 2018 to November 5, 2018. Prior to the Merger, he was President, CEO and member of the board

of Colony Capital. According to the Company's Schedule 14A filed with the SEC on March 29, 2017 (the "2017 Proxy Statement"), on February 28, 2017, Defendant Saltzman beneficially owned 3,420,719 shares[1] of the Company's common share equivalents.[2] Given that the price per share of the Company's Class A common stock at the close of trading on February 28, 2017 was $14.68, Saltzman owned over $50.2 million worth of Colony NorthStar stock.

24.    For the fiscal year ended December 31, 2017, Defendant Saltzman received $2,254,549 in compensation from the Company. This included $800,000 in salary, $1,423,727 in non-equity incentive plan compensation, and $30,822 in all other compensation.

25.    The Company's Schedule 14A filed with the SEC on April 3, 2018 (the "2018 Proxy Statement") stated the following about Defendant Saltzman:

> **Richard B. Saltzman**[3] is the President and Chief Executive Officer and a member of the Board of Directors of Colony NorthStar, having previously held the positions of President and Chief Executive Officer and a member of the Board of Directors of Colony Capital, the predecessor to Colony NorthStar. In addition, he is Chairman of the Board of Directors of Colony NorthStar Credit Real Estate, Inc. (NYSE: CLNC) as well as Chairman of the Board of Directors of Colony NorthStar Realty Europe Corp. (NYSE: NRE), companies that are externally managed by Colony NorthStar.
>
> Prior to joining the Colony Capital business in 2003, Mr. Saltzman spent 24 years in the investment banking business primarily specializing in real estate-related businesses and investments. Most recently, he was a Managing Director and Vice Chairman of Merrill Lynch's investment banking division. As a member of the investment banking operating committee, he oversaw the firm's global real estate, hospitality and restaurant businesses. Previously, he also served as Chief Operating Officer of Investment Banking and had responsibility for Merrill Lynch's Global Leveraged Finance business. Mr. Saltzman was also responsible for various real estate-related principal investments, including the Zell/Merrill Lynch series of

---

[1] Includes shares of restricted Class A common stock subject to time vesting, Defendant Saltzman's direct interest in 550,758 operating units of the Company's operating partnership, Colony Capital Operating Company, LLC, which are convertible to Class A common stock ("OP Units"), and 13,658 OP Units which were acquirable within 60 days.

[2] The Company defines common share equivalents as its Class A and Class B common stock, deferred stock units, and shares of Colony Capital Operating Company, LLC (OP Units and long-term incentive units ("LTIP Units")).

[3] Emphasis in original unless otherwise noted throughout.

funds which acquired more than $3.0 billion of commercial real estate assets and where he was a member of the investment committee.

Mr. Saltzman also serves on the Board of Directors of Kimco Realty Corporation (NYSE: KIM). Previously, he served on the Board of Trustees of Colony Starwood Homes (NYSE: SFR) from January 2016 to June 2017. He was also previously a member of the Board of Governors of the National Association of Real Estate Investment Trusts (NAREIT), on the board of directors of the Real Estate Roundtable and a member of the Board of Trustees of the Urban Land Institute, Treasurer of the Pension Real Estate Association, a Director of the Association of Foreign Investors in Real Estate and a past Chairman of the Real Estate Capital Policy Advisory Committee of the National Realty Committee.

Mr. Saltzman received his Bachelor of Arts from Swarthmore College in 1977 and a Master of Science in Industrial Administration from Carnegie Mellon University in 1979.

Mr. Saltzman's expertise in real estate-related businesses, investments and capital markets, developed through more than 38 years of real estate principal investing and investment banking experience, provides a valuable perspective to the Board in developing, leading and overseeing the Company's business as President and Chief Executive Officer. Mr. Saltzman's current and past service on the boards of real estate investment trusts and other real estate-based organizations also provides the Board with valuable perspectives into the real estate industry.

26.     Upon information and belief, Defendant Saltzman is a citizen of California.

**Defendant Barrack**

27.     Defendant Thomas J. Barrack, Jr. ("Barrack") is the Company's Executive Chairman and a member of the Board, roles he has held since the Merger. Prior to the merger, he was the founder and Executive Chairman of Colony Capital. According to the Company's 2017 Proxy Statement, on February 28, 2017, Defendant Barrack beneficially owned 29,443,835 shares of the Company's common share equivalents,[4] which represented 4.96% of the Company's

---

[4] Defendant Barrack held 100% of the Company's Class B common stock as of February 18, 2017. Class B common stock provides holders the same rights as Class A common stock, except that Class B shareholders are entitled to 36.5 votes per share on each matter on which holders of Class A common stock are entitled to vote. Thus, for the purposes of this complaint, Class B shares are considered to have at least equivalent value to Class A common shares.

outstanding common share equivalents on that date.[5] Given that the price per share of the
Company's Class A common stock at the close of trading on February 28, 2017 was $14.68,
Barrack owned over $432.2 million worth of Colony NorthStar common share equivalents as of
that date. Defendant Barrack also held 963,718 shares of the Company's preferred stock on
February 28, 2017, consisting of 373,784 shares of Series F Preferred Stock, 297,841 shares of
Series G Preferred Stock, and 292,093 shares of Series H Preferred Stock. The Company redeemed
its Series F Preferred Stock for $25 per share on June 23, 2017, for which Defendant Barrack
received over $9.3 million. The Company's Series G Preferred Stock began trading on January 2,
2018, opening at a price of $25.18. The Company's Series H preferred stock began trading on
January 2, 2018, opening at a price of $25.05. As Defendant Barrack made no dispositions of his
Series G or Series H Preferred Stock between February 28, 2017 and January 2, 2018, he owned
approximately $7.5 million and $7.3 million of the Company's Series G and Series H Preferred
Stock, respectively, on January 2, 2018.

28.     For the fiscal year ended December 31, 2017, Defendant Barrack received
$3,420,479 in compensation from the Company. This included $1 million in salary, $2,389,829 in
non-equity incentive plan compensation, and $30,650 in all other compensation.

29.     The Company's 2018 Proxy Statement stated the following about Defendant
Barrack:

> ***Thomas J. Barrack, Jr.*** is the Executive Chairman of Colony NorthStar, having
> previously held the position of Founder and Executive Chairman of Colony Capital,
> the predecessor to Colony NorthStar. Prior to founding the Colony Capital business
> in 1991, Mr. Barrack was a Principal with the Robert M. Bass Group, the principal
> investment vehicle of the Fort Worth, Texas investor Robert M. Bass. Prior to
> joining the Robert M. Bass Group, Mr. Barrack also served in the Reagan

---

[5] Includes Class A common shares (subject to timing vesting) held in a family trust of which
Defendant Barrack is trustee and OP Units held by Colony Capital, LLC and CCH Management
Partners I, LLC, each a Delaware limited liability company controlled by Defendant Barrack, and
shares of restricted Class A common stock subject to time vesting.

administration as Deputy Undersecretary of the Department of the Interior. Additionally, in 2010 French president Nicolas Sarkozy awarded him France's Chevalier de la Légion d'honneur.

From January 2016 through June 2017, Mr. Barrack served as co-chairman of the board of trustees of Colony Starwood Homes (NYSE: SFR), a leading single-family rental real estate investment trust. From January 2014 to May 2016, Mr. Barrack served on the board of directors of Carrefour S.A., a French multinational retailer and the second largest retailer in the world. Since June 2010, Mr. Barrack has served on the board of directors of First Republic Bank, a full-service bank and wealth management firm.

From January 2006 to April 2013, Mr. Barrack served on the public board of directors of Accor, S.A., a major global hotel group listed on Euronext Paris. Mr. Barrack has also served on the public board of Challenger Financial Services Group Limited, a diversified financial services organization listed on the Australian Securities Exchange from November 2007 to October 2010. From August 1994 to September 2007, Mr. Barrack served on the board of Continental Airlines, Inc., one of the largest passenger airlines in the United States, including as a member of its Corporate Governance Committee, Executive Committee and Human Resources Committee.

Mr. Barrack received a Bachelor of Arts in 1969 from the University of Southern California. He attended law school at the University of San Diego and the University of Southern California, where he was an editor of the law review, and received a Juris Doctor in 1972 from the University of San Diego. Mr. Barrack is the recipient of an Honorary Doctorate of Jurisprudence degree from Pepperdine University and a Trustee at the University of Southern California.

Mr. Barrack possesses significant vision and understanding of our Company's strategies and future direction. Mr. Barrack has a long track record and experience managing and investing in commercial mortgage loans and other CRE and real estate-related investments, including performing, sub-performing and non-performing loan portfolios and REO properties, through a variety of credit cycles and market conditions. Mr. Barrack's extensive investment experience in our target assets is key to the Board's oversight of the Company's investment strategy and management of its investment portfolio. Mr. Barrack's prior service as Deputy Undersecretary of the Department of the Interior also provides a unique government perspective to the Board.

30.     Upon information and belief, Defendant Barrack is a citizen of California.

**Defendant Tangen**

31.     Defendant Darren Tangen ("Tangen") has been the Company's CFO since the Merger and serves as the Company's Treasurer. According to the 2017 Proxy Statement, on February 28, 2017, Defendant Tangen beneficially owned 597,776 shares of the Company's common share equivalents.[6] Given that the price per share of the Company's Class A common stock at the close of trading on February 28, 2017 was $14.68, Tangen owned nearly $8.8 million worth of Colony NorthStar stock.

32.     For the fiscal year ended December 31, 2017, Defendant Tangen received $1,390,110 in compensation from the Company. This included $475,000 in salary, $885,788 in non-equity incentive plan compensation, and $29,322 in all other compensation.

33.     The Company's 2018 Proxy Statement stated the following about Defendant Tangen:

> **Darren J. Tangen** is an Executive Vice President and the Chief Financial Officer and Treasurer of Colony NorthStar. In addition, Mr. Tangen has served on the Board of Directors of Colony NorthStar Credit Real Estate, Inc. (NYSE: CLNC) since January 2018. Since 2002, Mr. Tangen has held various senior investment related roles at Colony, including Executive Director and Chief Financial Officer. Mr. Tangen was one of the key executives (Chief Financial Officer and Chief Operating Officer) responsible for Colony Financial, Inc. (NYSE:CLNY) having taken the company public in 2009 and leading it through its successful combination with Colony Capital, LLC in 2015. Prior to joining Colony in 2002, Mr. Tangen held positions at Credit Suisse and Colliers International (NASDAQ: CIGI).
>
> Mr. Tangen received his Bachelor of Commerce from McGill University and his Master of Business Administration in Finance and Real Estate at The Wharton School, University of Pennsylvania where he was recognized as a Palmer Scholar.

34.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Tangen made the

---

[6] Includes shares of restricted Class A common stock subject to time vesting, and 181,952 OP Units which were acquirable within 60 days.

following sales of Company stock (and made no purchases of Company stock). On May 12, 2017, Defendant Tangen sold 75,926 shares of Company stock for $13.12 per share. On September 28, 2017, Defendant Tangen sold 200,000 shares of Company stock for $12.42 per share. Thus, in total, before the fraud was exposed, he sold 275,926 Company shares on inside information, for which he received nearly $3.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

35.     Upon information and belief, Defendant Tangen is a citizen of California.

**Defendant Hamamoto**

36.     Defendant David T. Hamamoto ("Hamamoto") served as the Company's Executive Vice Chairman from the time of the Merger to January 11, 2018, when he resigned from all director and officer positions held with the Company, its affiliates, subsidiaries and any other entity in which the Company or its affiliates is the manager or serves in a similar capacity. According to the 2017 Proxy Statement, on February 28, 2017, Defendant Hamamoto beneficially owned 746,929 shares of the Company's common share equivalents, representing 1.25% of outstanding common share equivalents on that date. Given that the price per share of the Company's Class A common stock at the close of trading on February 28, 2017 was $14.68, Hamamoto owned nearly $11 million worth of Colony NorthStar stock.

37.     For the fiscal year ended December 31, 2017, Defendant Hamamoto received $52,991,759 in compensation from the Company. This included $28,270 in salary,[7] $52,952,689 in stock awards,[8] and $10,800 in all other compensation.

---

[7] Represents base salary payable by NAMG prior to the completion of the Merger and a nominal base salary of $1.00 for periods after the completion of the Merger.

[8] Represents the grant date fair value, computed in accordance with FASB ASC Topic 718, of stock awards that were granted to the former NAMG executive officers in early 2017. These

38.     The Company's 2017 Proxy Statement stated the following about Defendant

Hamamoto:

> **David T. Hamamoto** (age 57) is the Executive Vice Chairman of Colony NorthStar,
> having previously held the position of Executive Chairman of NSAM, the
> predecessor to Colony NorthStar, since August 2015. Prior to that position,
> Mr. Hamamoto served as NSAM's Chairman and Chief Executive Officer from
> January 2014 until August 2015. Mr. Hamamoto held the position of Chairman of
> the board of directors of NRF from October 2007 until January 2017, having served
> as one of its directors since October 2003. Mr. Hamamoto also served as NRF's
> Chief Executive Officer from October 2004 until August 2015 and President from
> October 2004 until April 2011. Mr. Hamamoto has been Chairman of the board of
> directors of Colony NorthStar Europe (NYSE: NRE) since October 2015 and has
> served as one of its directors since June 2015.
>
> Mr. Hamamoto served as Chairman of Colony NorthStar Real Estate Income Trust,
> Inc. from February 2009 until August 2015 and served as Chief Executive Officer
> from February 2009 until January 2013. In addition, Mr. Hamamoto served as
> Chairman of Colony NorthStar Healthcare Income, Inc. from January 2013 until
> January 2014, and of Colony NorthStar Real Estate Income II, Inc. from December
> 2012 until August 2015. Mr. Hamamoto also served as Co-Chairman of Colony
> NorthStar/RXR New York Metro Real Estate, Inc. ("Colony NorthStar/RXR")
> from March 2014 until August 2015.
>
> Additionally, Mr. Hamamoto serves as a member of the advisory committee of
> RXR Realty LLC, a leading real estate operating and investment management
> company focused on high-quality real estate investments in the New York Tri-
> State area and a co-sponsor of Colony NorthStar/RXR, a position he has held since
> December 2013. Mr. Hamamoto also serves as a member of the executive
> committee of Island Hospitality Management Inc., a position he has held since
> January 2015. In July 1997, Mr. Hamamoto co-founded Colony NorthStar Capital
> Investment Corp., the predecessor to NRF, for which he served as Co-
> Chief Executive Officer until October 2004.
>
> From 1983 to 1997, Mr. Hamamoto worked for Goldman, Sachs & Co. ("Goldman
> Sachs") where he was co-head of the Real Estate Principal Investment Area and
> general partner of the firm between 1994 and 1997. During Mr. Hamamoto's tenure
> at Goldman Sachs, he initiated the firm's effort to build a real estate principal
> investment business under the auspices of the Whitehall Funds.

---

awards consist of the replacement equity awards granted pursuant to the letter agreements with the
former NAMG executive officers in connection with the Merger and equity awards granted in
early 2017 as long-term bonus for 2016. The fair value of the restricted shares of the Company's
common stock or LTIP units was determined based on our stock price on the grant date.

Mr. Hamamoto holds a Bachelor of Science from Stanford University in Palo Alto, California and a Master of Business Administration from the Wharton School of Business at the University of Pennsylvania in Philadelphia, Pennsylvania.

Mr. Hamamoto offers our Board an intuitive perspective of the business and operations of the Company as a whole. Mr. Hamamoto also has significant experience in all aspects of the commercial real estate markets, which he gained initially as co-head of the Real Estate Principal Investment Area at Goldman Sachs. Mr. Hamamoto is able to draw on his extensive knowledge to develop and articulate sustainable initiatives, operational risk management and strategic planning, which qualify him to serve as a director.

39.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Hamamoto made the following sales of Company stock (and made no purchases of Company stock). On December 14, 2017, Defendant Hamamoto sold 1,109,960 shares of Company stock for $12.14 per share. On December 15, 2017, Defendant Hamamoto sold 666,169 shares of Company stock for $12.04 per share. On December 18, 2017, Defendant Hamamoto sold 449,780 shares of Company stock for $12.05 per share. Thus, in total, before the fraud was exposed, he sold 2,225,909 Company shares on inside information, for which he received over $26.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

40.     Upon information and belief, Defendant Hamamoto is a citizen of New York.

**Defendant Redington**

41.     Defendant Neale Redington ("Redington") has served the Company's CAO since the Merger and is a Managing Director of the Company. According to the 2017 Proxy Statement, on February 28, 2017, Defendant Redington beneficially owned 82,957 shares of the Company's common share equivalents.[9] Given that the price per share of the Company's Class A common

---

[9] Includes shares of restricted Class A common stock subject to time vesting, and 6,757 OP Units which were acquirable within 60 days.

stock at the close of trading on February 28, 2017 was $14.68, Redington owned approximately

$1.2 million worth of Colony NorthStar stock.

42.     The Company's 2018 Proxy Statement stated the following about Defendant

Redington:

> ***Neale W. Redington*** is a Managing Director and the Chief Accounting Officer of
> Colony NorthStar, having previously held the same positions at Colony.
> Mr. Redington is responsible for financial accounting and reporting for firm-
> sponsored investments and related affiliates and subsidiaries. In addition, Mr.
> Redington has served as Chief Accounting Officer of Colony NorthStar Credit Real
> Estate, Inc. (NYSE: CLNC) since January 2018.
>
> Prior to joining the Colony business in 2008, Mr. Redington was an audit partner
> in the real estate and hospitality practice of Deloitte & Touche LLP. During his
> twenty years with Deloitte, Mr. Redington worked in both London and Los
> Angeles.
>
> Mr. Redington, a Certified Public Accountant (license inactive) and a Chartered
> Accountant in England & Wales, received a Bachelor of Commerce in Accounting
> degree with Honors in 1987 from the University of Birmingham in England.

43.     During the period of time when the Company materially misstated information to

keep the stock price inflated, and before the scheme was exposed, Defendant Redington made the

following sale of Company stock (and made no purchases of Company stock). On December 20,

2017, Defendant Redington sold 12,500 shares of Company stock for $11.74 per share, for which

he received approximately $146,750. His insider sale made with knowledge of material non-public

information before the material misstatements and omissions were exposed demonstrates his

motive in facilitating and participating in the scheme.

44.     Upon information and belief, Defendant Redington is a citizen of California.

**Defendant Crocker**

45.     Defendant Douglas Crocker II ("Crocker") has served as a Company director since

the Merger and is a member of the Audit Committee.

46.     For the fiscal year ended December 31, 2017, Defendant Crocker received $308,506 in compensation from the Company. This included $97,500 in fees earned or paid in cash and $211,006 in stock awards.

47.     The Company's 2018 Proxy Statement stated the following about Defendant Crocker:

> **Douglas Crocker II** is a non-executive director of Colony NorthStar. Mr. Crocker has been the managing partner of DC Partners LLC, a firm that invests in and develops apartment properties, since 2013. From 2006 to 2013, Mr. Crocker was the Chairman of Pearlmark Multifamily Partners, L.L.C. (formerly known as Transwestern Multifamily Partners, L.L.C.), a commercial real estate firm. He was the Chief Executive Officer of Equity Residential, a multi-family residential REIT, from December 1992 until his retirement in December of 2002.
>
> During his more than 40 years of real estate experience, Mr. Crocker has previously served as: Executive Vice President of Equity Financial and Management Company, a subsidiary of Equity Group Investments, Inc. ("EGI"), which provides strategic direction and services for EGI's real estate and corporate activities; President, Chief Executive Officer and a director of First Capital Corporation, a sponsor of public limited real estate partnerships; Managing Director of Prudential Securities Inc., a financial services brokerage firm; Chief Executive Officer of McKinley Finance Group, a privately held company involved with real estate, banking and corporate finance; President of American Invesco, the nation's largest condominium conversion company; and Vice President of Arlen Realty and Development Company, a diversified real estate and retail company. Mr. Crocker currently is a member of the board of directors of Acadia Realty Trust, a publicly traded REIT, since 2003. Previously, during the past five years, Mr. Crocker was a member of the board of directors of the following publicly traded companies: Care Capital Properties, Inc., from August 2015 until August 2017, when the company merged into Sabra Health Care REIT, Inc.; Ventas, Inc. from 1998 until May 2016; CYS Investments, Inc. from 2007 to May 2015; Associated Estates Realty Corporation from December 2014 until August 2015, when the company was sold to a real estate fund managed by Brookfield Asset Management Inc.; and Post Properties, Inc. from 2004 to May 2012.
>
> Mr. Crocker is a member of the National Multi-Housing Council, having previously served as its Chairman. In addition, Mr. Crocker currently serves as a trustee of Milton Academy and New Bedford Whaling Museum, and formerly served as a trustee of Urban Land Institute and DePaul University. Mr. Crocker has been a five-time recipient of Commercial Property News' Multifamily Executive of the Year Award, a three-time winner of their REIT Executive of the Year Award, a three-time winner of Realty Stock Review's Outstanding CEO Award, and received the

National Association of Real Estate Investment Trusts (NAREIT) 2010 Edward H. Linde Industry Leadership Award. Mr. Crocker is also a member of the National Association of Corporate Directors (NACD).

Mr. Crocker holds a Bachelor of Arts from Harvard University.

Mr. Crocker's expertise as a successful, well-respected and recognized leader in the real estate industry, with extensive executive experience and strong skills in corporate finance, mergers and acquisitions, strategic planning, public company executive compensation, and corporate governance, qualify him to serve as a director.

48.     Upon information and belief, Defendant Crocker is a citizen of Illinois.

**Defendant Fosheim**

49.     Defendant Jon A. Fosheim ("Fosheim") has served as a Company director since the Merger and is a member of the Audit Committee. According to the 2017 Proxy Statement, on February 28, 2017, Defendant Fosheim beneficially owned 2,000 shares of the Company's common share equivalents. Given that the price per share of the Company's Class A common stock at the close of trading on February 28, 2017 was $14.68, Fosheim owned about $29,360 worth of Colony NorthStar stock.

50.     For the fiscal year ended December 31, 2017, Defendant Fosheim received $323,131 in compensation from the Company. This included $112,125 in fees earned or paid in cash and $211,006 in stock awards.

51.     The Company's 2018 Proxy Statement stated the following about Defendant Fosheim:

> ***Jon A. Fosheim*** is a non-executive director of Colony NorthStar. Previously, Mr. Fosheim was the Chief Executive Officer of Oak Hill REIT Management, LLC (Oak Hill) from 2005 until he retired in 2011. Oak Hill is a hedge fund specializing in REIT investments. From 1985 until 2005, Mr. Fosheim was a Principal and Co-founder of Green Street Advisors, a REIT advisory and consulting firm. Prior to that, Mr. Fosheim worked in institutional sales at Bear Stearns & Co., a global investment bank, and worked in the tax department at Touche Ross and Co. (now Deloitte LLP), an international accounting firm. Mr. Fosheim also serves as a

member of the board of directors, including its audit committee and corporate governance committee, of Apple Hospitality REIT, Inc., a publicly traded REIT, positions he has held since January 2015. Mr. Fosheim also served as a member of the board of Associated Estates Realty Corporation, a publicly traded REIT, from February 2015 until August 2015, when the company was sold to a real estate fund managed by Brookfield Asset Management Inc.

In addition, Mr. Fosheim is a director and chairman of the audit committee of the Arnold and Mabel Beckman Foundation, a nonprofit foundation established for the purpose of supporting scientific research. In 2003, Mr. Fosheim was a recipient of the National Association of Real Estate Investment Trusts (NAREIT) Industry Achievement Award.

Mr. Fosheim holds a Bachelor of Arts, Master of Business Administration and Juris Doctor, each from the University of South Dakota.

Mr. Fosheim's extensive investment management experience and his leadership and management background provides him with the skills and qualifications to serve as a director.

52.     Upon information and belief, Defendant Fosheim is a citizen of California.

**Defendant Metz**

53.     Defendant Justin E. Metz ("Metz") has served as a Company director since the Merger. According to the 2017 Proxy Statement, on February 28, 2017, Defendant Metz beneficially owned 19,867 shares of the Company's common share equivalents. Given that the price per share of the Company's Class A common stock at the close of trading on February 28, 2017 was $14.68, Metz owned about $291,647 worth of Colony NorthStar stock.

54.     For the fiscal year ended December 31, 2017, Defendant Metz received $311,423 in compensation from the Company. This included $100,417 in fees earned or paid in cash[10] and $211,006 in stock awards.

55.     The Company's 2018 Proxy Statement stated the following about Defendant Metz:

*Justin E. Metz* is a non-executive director of Colony NorthStar. Previously, Mr.

---

[10] Includes $2,917 received as cash compensation for Defendant Metz's service as a non-employee director of NAMG in 2017 prior to the closing of the Merger.

Metz served as an independent director of NSAM, a position he had held from June 2014 until January 2017. Mr. Metz is also the Managing Principal of the Related Companies' real estate fund management team, which he founded in April 2009, operating from offices in New York, Chicago, Boston, Dallas and Los Angeles and staffed with industry veterans. The fund management platform currently manages capital on behalf of sovereign wealth funds, public pension plans, multi-managers, endowments, Taft Hartley plans and family offices across the following strategies: distressed and value added real estate opportunities, origination and acquisition of construction and transitional loans and multifamily housing opportunities across the United States.

Prior to joining Related Companies, Mr. Metz served as a Managing Director at Goldman Sachs. During his 12 years at Goldman Sachs, Mr. Metz held numerous positions of increasing responsibility and served on various boards and investment committees. Mr. Metz is a principal shareholder of Related Fund Management, LLC and Sousa Holdings, LLC. Mr. Metz holds a Bachelor of Arts from the University of Michigan.

Mr. Metz's real estate investment experience, coupled with his leadership experience from his service on various boards and investment committees, qualify him to serve as a director.

56.     Upon information and belief, Defendant Metz is a citizen of New York.

**Defendant Parker**

57.     Defendant George G. C. Parker ("Parker") has served as a Company director since the Merger and serves as chair of the Audit Committee. According to the 2017 Proxy Statement, on February 28, 2017, Defendant Parker beneficially owned 39,294 shares of the Company's common share equivalents. Given that the price per share of the Company's Class A common stock at the close of trading on February 28, 2017 was $14.68, Parker owned approximately $576,835 worth of Colony NorthStar stock.

58.     For the fiscal year ended December 31, 2017, Defendant Parker received $328,006 in compensation from the Company. This included $117,000 in fees earned or paid in cash and $211,006 in stock awards.

59.    The Company's 2018 Proxy Statement stated the following about Defendant

Parker:

> ***George G. C. Parker, Ph.D.*** is a non-executive director of Colony NorthStar. He previously served as a director for Colony Capital, the predecessor to Colony NorthStar, since its initial public offering in September 2009 until January 2017. Professor Parker has been a distinguished member of the finance faculty of Stanford University's Graduate School of Business since 1973 and is currently the Dean Witter Distinguished Professor of Finance (Emeritus). At Stanford, Professor Parker has held a series of senior positions, including Senior Associate Dean for Academic Affairs, Director of the M.B.A. Program, Director for Executive Education, and Director of the Stanford Sloan Program for Executives.
>
> Professor Parker is a member of the board of directors of First Republic Bank, a California banking company. Professor Parker also served on the board of directors of Threshold Pharmaceuticals, Inc., a publicly traded biotechnology company, from October 2004 until its merger with Molecular Templates in August 2017. From March 2001 to January 2015, Professor Parker served on the board of directors of iShares Exchange Traded Funds, an investment company, including as independent chairman. Professor Parker served as a member of the board of directors of Tejon Ranch Company, a publicly traded real estate development company, from May 1998 to March 2015, including as Chairman of its Audit Committee. From 1996 to 2009, Professor Parker served on the public board of Continental Airlines, Inc., including as Chairman of its Audit Committee.
>
> Professor Parker holds a Bachelor of Science from Haverford College and a Master of Business Administration and Ph.D. from the Stanford Graduate School of Business.
>
> Professor Parker's understanding of business and finance concepts, acquired through his over 40 years of academic study and teaching, provides the Board with significant business acumen as the Company positions itself for future growth and development. In addition, Professor Parker's extensive experience in an academic environment, including his position teaching about corporate governance and management compensation at Stanford Business School, allows him to advise on rapidly changing market conditions and provide perspective for the Board. Professor Parker also serves as an audit committee financial expert on the Board's Audit Committee. Professor Parker's service on other public company boards also lends insights into public company operations and provides different perspectives on Board practices and governance matters.

60.    Upon information and belief, Defendant Parker is a citizen of California.

**Defendant Schoenherr**

61.     Defendant Charles W. Schoenherr ("Schoenherr") has served as a Company director since the Merger and is a member of the Audit Committee. According to the 2017 Proxy Statement, on February 28, 2017, Defendant Schoenherr beneficially owned 30,604 shares of the Company's common share equivalents. Given that the price per share of the Company's Class A common stock at the close of trading on February 28, 2017 was $14.68, Schoenherr owned approximately $449,266 worth of Colony NorthStar stock.

62.     For the fiscal year ended December 31, 2017, Defendant Schoenherr received $308,506 in compensation from the Company. This included $97,500 in fees earned or paid in cash and $211,006 in stock awards.

63.     The Company's 2018 Proxy Statement stated the following about Defendant Schoenherr:

> **Charles W. Schoenherr** is a non-executive director of Colony NorthStar. Mr. Schoenherr serves as Managing Director of Waypoint Residential, LLC which invests in multifamily properties in the Sunbelt. He has served in this capacity since January 2011 and is responsible for sourcing acquisition opportunities and raising capital.
>
> Until January 2017, Mr. Schoenherr served as an independent director of NRF, Colony NorthStar Realty Europe Corp. (NYSE: NRE) and Colony NorthStar Real Estate Income II, Inc. positions he had held from June 2014, October 2015 and December 2012, respectively. Mr. Schoenherr also previously served as an independent director of Colony NorthStar Real Estate Income Trust, Inc. from January 2010 to October 2015. From June 2009 until January 2011, Mr. Schoenherr served as President of Scout Real Estate Capital, LLC, a full service real estate firm that focuses on acquiring, developing and operating hospitality assets, where he was responsible for managing the company's properties and originating new acquisition and asset management opportunities.
>
> Prior to joining Scout Real Estate Capital, LLC, Mr. Schoenherr was the managing partner of Elevation Capital, LLC, where he advised real estate clients on debt and equity restructuring and performed due diligence and valuation analysis on new acquisitions between November 2008 and June 2009. Between September 1997 and October 2008, Mr. Schoenherr served as Senior Vice President and Managing

Director of Lehman Brothers' Global Real Estate Group, where he was responsible for originating debt, mezzanine and equity transactions on all major property types throughout the United States. During his career he has also held senior management positions with GE Capital Corporation, GE Investments, Inc. and KPMG LLP, where he also practiced as a certified public accountant. Mr. Schoenherr currently serves on the Board of Trustees of Iona College and is on its Real Estate and Investment Committees.

Mr. Schoenherr holds a Bachelor of Business Administration in Accounting from Iona College and a Master of Business Administration in Finance from the University of Connecticut.

Mr. Schoenherr's expertise in and knowledge of real estate investment and finance industries, including extensive experience originating debt, mezzanine and equity transactions, qualify him to serve as a director.

64.     Upon information and belief, Defendant Schoenherr is a citizen of Connecticut.

**Defendant Somers**

65.     Defendant John A. Somers ("Somers") has served as a Company director since the Merger. According to the 2017 Proxy Statement, on February 28, 2017, Defendant Somers beneficially owned 43,960 shares of the Company's common share equivalents, and 500 shares of the Company's Series F Preferred Stock. Given that the price per share of the Company's Class A common stock at the close of trading on February 28, 2017 was $14.68, Somers owned at least $645,332 worth of Colony NorthStar stock. The Company redeemed its Series F Preferred Stock for $25 per share on June 23, 2017, for which Defendant Somers received $12,500.

66.     For the fiscal year ended December 31, 2017, Defendant Somers received $323,131 in compensation from the Company. This included $112,125 in fees earned or paid in cash and $211,006 in stock awards.

67.     The Company's 2018 Proxy Statement stated the following about Defendant Somers:

*John A. Somers* is a non-executive director of Colony NorthStar. He previously served as a director for Colony Capital, the predecessor to Colony NorthStar, since

its initial public offering in September 2009 until January 2017. Mr. Somers has been a private investor since June 2006. From 1996 to June 2006, Mr. Somers was Head of Fixed Income and Real Estate for Teachers Insurance and Annuity Association and College Retirement Equities Fund (TIAA-CREF), and served there as an Executive Vice President from 1996 to 2004. From 1981 to 1996, Mr. Somers served as Senior Vice President and Head of Commercial Mortgages and Real Estate for TIAA-CREF. Prior to joining TIAA-CREF, from 1972 to 1981, Mr. Somers held several positions in the Real Estate Investment Department, including Vice President, for Prudential Insurance Company of America. He also served as Senior Vice Chairman of The National Realty Committee in Washington, D.C. and as Chairman of NYU's Real Estate Institute.

Mr. Somers was a member of the board of directors of Guardian Life Insurance Company of America from 1996 through 2016. He served as a member of the audit & risk committee, the human resources and governance committee and served as chairman of its audit committee and investment committee. From 1986 to 2005 and again from 2011 through 2016, Mr. Somers served as a member of the board of directors of The Community Preservation Corporation, a 501(c)(3) not-for-profit corporation focused on low and moderate income housing development in New York City, and served as its Chairman, a member of its Executive Committee and Chairman of its Governance and Compensation Committee. Between 1990 and 2003, Mr. Somers served as director of Emigrant Savings Bank.

Mr. Somers received his Bachelor of Science in Economics from Villanova University in 1966 and a Master of Business Administration in Finance from the University of Connecticut in 1972.

Mr. Somers's commercial mortgage and real estate investment experience allows him to provide sound advice on the Company's objectives to acquire, originate and manage real estate-related investments. Mr. Somers served as a member of the independent special committee representing the Company's interests in the Combination. His position as Head of Fixed Income and Real Estate for TIAA-CREF provided Mr. Somers with extensive insight into the debt markets and real estate-related investments that provides a leadership perspective to the Board.

68.     Upon information and belief, Defendant Somers is a citizen of Florida.

**Defendant Steffens**

69.     Defendant John L. Steffens ("Steffens") has served as a Company director since the

Merger. According to the 2017 Proxy Statement, on February 28, 2017, Defendant Steffens

beneficially owned 51,690 shares of the Company's common share equivalents. Given that the

price per share of the Company's Class A common stock at the close of trading on February 28,

2017 was $14.68, Steffens owned approximately $758,809 worth of Colony NorthStar stock.

70.    For the fiscal year ended December 31, 2017, Defendant Steffens received

$323,131 in compensation from the Company. This included $112,125 in fees earned or paid in

cash and $211,006 in stock awards.

71.    The Company's 2018 Proxy Statement stated the following about Defendant

Steffens:

> ***John L. Steffens*** is a non-executive director of Colony NorthStar. He previously
> served as a director for Colony Capital, Inc., the predecessor to Colony NorthStar,
> since its initial public offering in September 2009 until January 2017. Mr. Steffens
> is the founder of Spring Mountain Capital, LP (Spring Mountain Capital). Founded
> in 2001, Spring Mountain Capital specializes in providing advisory services and
> alternative investments for institutional and private investors. Prior to establishing
> Spring Mountain Capital, Mr. Steffens spent 38 years at Merrill Lynch & Co., Inc.,
> where he held numerous senior management positions, including President of
> Merrill Lynch Consumer Markets (which was later named the Private Client Group)
> from July 1985 until April 1997, and both Vice Chairman of Merrill Lynch & Co.,
> Inc. (the parent company) and Chairman of its U.S. Private Client Group from April
> 1997 until July 2001.
>
> Mr. Steffens served on the Board of Directors of Merrill Lynch & Co., Inc. from
> April 1986 until July 2001. He also served as a member of the Board of Directors
> of Merrill Lynch Ventures, LLC (a $1.8 billion private equity fund for key
> employees). Mr. Steffens currently serves on the Advisory Board of StarVest
> Partners, the Advisory Board of Wicks Communication & Media Partners, L.P.,
> and as Chairman of the Board of Directors of Cicero, Inc., a publicly traded
> provider of business integration software, since May 2007. Also, on October 1,
> 2011, Mr. Steffens was appointed to the Board of Overseers of the Geisel School
> of Medicine at Dartmouth, on which he currently serves. From January 2016 to
> June 2017, Mr. Steffens served on the board of trustees of Colony Starwood Homes
> (NYSE: SFR). From June 2004 to February 2009, Mr. Steffens served on the public
> board of Aozora Bank, Ltd., a financial services institution in Japan. Mr. Steffens
> has served as Chairman of the Securities Industry Association, as a Trustee of the
> Committee for Economic Development, and is currently National Chairman
> Emeritus of the Alliance for Aging Research.
>
> Mr. Steffens graduated with a Bachelor of Arts in Economics from Dartmouth
> College in 1963. He also attended the Advanced Management Program of the
> Harvard Business School in 1979.

Mr. Steffens's years of investment experience, advisory work and senior leadership positions at Merrill Lynch devoted to private client work provides the Board with an investor perspective. Mr. Steffens's extensive contacts developed through his service with a significant number of securities and financial firms provide the Board with a view into markets that is invaluable. Mr. Steffens's service as a director of other public companies also helps provide the Board with different perspectives on Board practices and governance matters.

72. Upon information and belief, Defendant Steffens is a citizen of New York.

## **RELEVANT NON-PARTY**

### **Nancy A. Curtin**

72.    Nancy A. Curtin ("Curtin") has served as a Company director since the Merger.

73.    The Company's 2018 Proxy Statement stated the following about Curtin:

***Nancy A. Curtin*** is a non-executive director of Colony NorthStar, having previously served as a director of Colony Capital, the predecessor to Colony NorthStar, from August 2014 to January 2017. Ms. Curtin is the Chief Investment Officer and Head of Investments of Close Brothers Asset Management (CBAM). CBAM is the asset management arm of Close Brothers Group Plc, (CBG). Established in 1878, CBG is a specialist financial services group engaged in banking, securities and asset management activities. CBG is listed on the London Stock Exchange and is a member of the FTSE 250, with over 2,700 employees. With over 550 employees it is focused on providing investment management and wealth structuring to a broad range of UK and European clients, both onshore and offshore.

Prior to CBAM, Ms. Curtin has had a range of senior roles in asset management, private equity and alternative asset investing. She served as the Chief Investment Officer and Managing Partner of Fortune Asset Management Limited, an alternative asset management firm working with institutional, HNW and family office clients, from April 2002 until it was purchased by CBAM in January 2010. Ms. Curtin was Managing Director of Schroders Plc, a £268 billion global asset management firm, where she was also Head of Global Investments for the Mutual Funds business. Prior to Schroders, Ms. Curtin was Head of Emerging Markets at Baring Asset Management, a £60 billion global investment management firm, currently owned by MassMutual Financial Group.

Ms. Curtin received a Bachelor of Arts in political science, summa cum laude, from Princeton University in 1979 and a Master of Business Administration from Harvard Business School in 1983.

Ms. Curtin's years of investment management experience and senior roles in asset management, private equity and alternative asset investing is key to the Board's oversight of the Company's investment strategy and management of its investment portfolio. Ms. Curtin's extensive experience as a senior investment professional in London and across Europe provides the Board and management invaluable perspective on the Company's focus on European investment opportunities.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

74.     By reason of their positions as officers and/or directors of Colony NorthStar and because of their ability to control the business and corporate affairs of Colony NorthStar, the Individual Defendants owed Colony NorthStar and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Colony NorthStar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Colony NorthStar and its shareholders so as to benefit all shareholders equally.

75.     Each director and officer of the Company owes to Colony NorthStar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

76.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Colony NorthStar, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

77.     To discharge their duties, the officers and directors of Colony NorthStar were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

78.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Colony NorthStar, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Colony NorthStar's Board at all relevant times.

79.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

80.     To discharge their duties, the officers and directors of Colony NorthStar were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Colony NorthStar were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Maryland, California, and the United States, and pursuant to Colony NorthStar's own internal guidelines, including its Code of Business

Conduct and Ethics and Code of Ethics for Principal Executive Officer and Senior Financial Officers;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Colony NorthStar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Colony NorthStar and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Colony NorthStar's operations would comply with all laws and Colony NorthStar's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

81.     Each of the Individual Defendants further owed to Colony NorthStar and the shareholders the duty of loyalty requiring that each favor Colony NorthStar's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

82.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Colony NorthStar and were at all times acting within the course and scope of such agency.

83.     Because of their advisory, executive, managerial, and directorial positions with Colony NorthStar, each of the Individual Defendants had access to adverse, non-public information about the Company.

84.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Colony NorthStar.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

85.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

86.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act.

87.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Colony NorthStar was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

88.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

89.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Colony NorthStar and was at all times acting within the course and scope of such agency.

**NORTHSTAR'S CODE OF BUSINESS CONDUCT AND ETHICS**

90.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct") "is

intended to cover the Company's and its controlled subsidiaries' directors, officers and employees

(collectively, '**Covered Persons**')."

91.     The Code of Conduct states that "[e]ach Covered Person is expected (i) to read and

understand this Code and its application to the performance of his or her business responsibilities

and (ii) to conduct himself or herself in accordance with this Code and to seek to avoid even the

appearance of wrongdoing or improper behavior."

92.     The Code of Conduct provides, as to "Honest and Ethical Conduct," that

Each Covered Person must always conduct himself or herself in an honest and
ethical manner. Each Covered Person must act with the highest standards of
personal and professional integrity and not tolerate others who attempt to deceive
or evade responsibility for their actions. All actual or potential conflicts of interest
between personal and professional relationships must be handled honestly, ethically
and in accordance with the policies specified in this Code. In addition, all Covered
Persons must be direct, honest and truthful in discussions with, or requests for
information from, the Board, regulatory agency officials and government officials,
as well as in all dealings with business partners and stockholders.

93.     With respect to "Compliance with Applicable Laws, Rules and Regulations," the

Code of Conduct provides, in relevant part:

All Covered Persons must respect and obey the laws, rules and regulations
(including insider trading laws) of the jurisdictions in which we operate and the
rules and regulations applicable to the Company's business, including those of the
New York Stock Exchange (the "**NYSE**") and the Securities and Exchange
Commission (the "**SEC**"). Although not all Covered Persons are expected to know
the details of the laws, rules and regulations to which the Company is subject, it is
important to understand enough to determine when it is necessary or appropriate to
seek advice from supervisors, managers or other persons, including the Chief
Compliance Officer, who can provide guidance on such matters.

94.     The Code of Conduct provides, in the section titled "Compliance Procedures;

Reporting Violations," in relevant part, that:

. . . any Covered Person who becomes aware of any existing or potential violation of this Code or any law, rule or regulation or Company policy has an obligation to report his or her complaint or concern to his or her supervisor, to the Chief Compliance Officer, the Company's Chief Financial Officer or the Chairperson of the Audit Committee of the Board (if such complaint or concern is related to financial, accounting or auditing matters) . . .

95.    The Code of Conduct provides, in the section titled "Accounting Complaints," that:

The Company's policy is to comply fully with all applicable financial reporting and accounting regulations. If any Covered Person has unresolved concerns or complaints regarding questionable accounting, internal control or auditing matters concerning the Company, such person is encouraged to report such concerns or complaints to the Governance Hotline, Chief Compliance Officer, Chief Financial Officer or Chairperson of the Audit Committee.

96.    The Code of Conduct provides, in the section titled "Public Disclosure," that:

The Company is committed to providing full, fair, accurate, timely and understandable disclosure in the current reports, periodic reports and other information it files with or submits to the SEC and in other public communications, such as press releases, earnings conference calls and industry conferences, made by the Company or on the Company's behalf. In meeting such standards for disclosure, the Company's officers and directors shall at all times strive to comply with the Company's disclosure obligations and, as necessary, appropriately consider and balance the need or desirability for confidentiality with respect to non-public negotiations or other business developments.

The Company's Chief Executive Officer and Chief Financial Officer are responsible for establishing effective disclosure controls and procedures and internal control over financial reporting within the meaning of applicable SEC rules and regulations. The Company expects the Chief Executive Officer and the Chief Financial Officer to take a leadership role in implementing such controls and procedures and to position the Company to comply fully with its disclosure obligations within the timeframe required under applicable SEC rules and regulations.

No Covered Person should interfere with, hinder or obstruct the Company's efforts to meet the standards for public disclosure set forth above. In addition, all Covered Persons must strictly adhere to the Company's system of internal disclosure controls, including by promptly reporting (i) any event or occurrence that arises in the course of their duties that may have a material impact on the Company's financial condition or operations and (ii) any actual or suspected breaches of the Company's internal control procedures.

97.    The Code of Conduct provides, in the section titled "Insider Trading," that:

Covered Persons who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of the Company's business. All non-public information about the Company should be considered confidential information. To use non-public information for personal financial benefit, or to "tip" others (including without limitation friends and Family Members) who might make an investment decision on the basis of this information, is not only unethical but also illegal. . . .

98.    The Code of Conduct provides, in the section titled "Business Records," that:

The Company's responsibilities to its stockholders and the investing public require that all of the Company's books, records, accounts and financial statements be maintained in reasonable detail, appropriately reflect the Company's transactions and conform to applicable legal requirements, the Company's system of internal controls and accounting principles generally accepted in the United States ("**GAAP**"). The Company relies on the accuracy and completeness of its business records to (i) provide full, fair, accurate, timely and understandable disclosure in the current reports, periodic reports and other information it files with or submits to the SEC and in other public communications, such as press releases, earnings conference calls and industry conferences, made by the Company or on the Company's behalf, (ii) make management decisions and (iii) analyze its operations. The accuracy of such records is essential for continued, long-term business success.

No false, misleading or artificial entries may be made by any Covered Person in the books and records of the Company. All Covered Persons with supervisory responsibility shall establish and implement appropriate internal accounting controls over all areas of their responsibility to ensure the safeguarding of the Company's assets and the accuracy of its financial records and reports. The Company has adopted controls in accordance with internal needs and the requirements of applicable laws and regulations. These established accounting practices and procedures must be followed to assure the complete and accurate recording of all transactions. All Covered Persons, within their areas of responsibility, are expected to adhere to these procedures, as directed by the Chief Financial Officer . . .

99.    The Individual Defendants violated the Code of Conduct by making and/or causing the Company to make the false and misleading statements and/or omissions discussed herein and to violate applicable laws and regulations. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading.

## NORTHSTAR'S CODE OF ETHICS FOR PRINCIPAL EXECUTIVE OFFICER AND SENIOR FINANCIAL OFFICERS

100.    The Company's Code of Ethics for Principal Executive Officer and Senior Financial Officers (the "Code of Ethics") "applies to the principal executive officer and all senior financial officers of the Company including the principal financial officer, the principal accounting officer or controller and other senior financial persons performing similar functions who have been identified by the principal executive officer (each a '**Covered Officer**')."

101.    The Code of Ethics provides, as to "Honest and Ethical Conduct" that "all Covered Officers must be direct, honest and truthful in discussions with, or requests for information from, regulatory agency officials and government officials, as well as in all dealings with business partners and stockholders."

102.    The Code of Ethics provides, in the section titled "Full, Fair, Accurate, Timely and Understandable Disclosure," that:

> The Covered Officers share responsibility for full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications, such as press releases, earnings conference calls and industry conferences made by or on behalf of the Company. In order to fulfill such obligation, each Covered Officer must, to the extent the following are within such Covered Officer's areas of responsibility:
>
> a.  Carefully review drafts of reports and documents the Company is required to file with, or submit to, the SEC before they are filed, or submitted, and Company press releases or other public communications before they are released to the public, with particular focus on disclosures each Covered Officer does not understand or agree with and on information known to the Covered Officer that is not reflected in the report, document, press release or public communication.
> b.  Comply with the Company's Disclosure Controls, Policies and Procedures as in effect from time to time, which have been designed to ensure that the information required to be disclosed by the Company in its SEC filings is collected, processed, summarized and disclosed in a timely fashion and accumulated and communicated to the appropriate persons.

c.   Promptly bring to the attention of the Disclosure Committee or a
member thereof any material information of which a Covered Officer
may become aware that affects the disclosures made by the Company in
its public filings, any material information that may assist the Disclosure
Committee in fulfilling its responsibilities, matters that a Covered
Officer feels could compromise the integrity of the Company's financial
reports or disagreements on accounting matters.

d.   Always act with the highest standards of personal and professional
integrity: do not tolerate others who, attempt to deceive, or evade
responsibility for actions.

103.   The Code of Ethics provides, in the section titled "Compliance with Applicable

Laws, Rules and Regulations," in relevant part:

Compliance with applicable laws, rules and regulations, both in letter and in spirit
is one of the foundations on which this Company's ethical standards are built. Each
Covered Officer must understand, respect and take responsibility for complying
with the applicable laws, rules and regulations (including insider trading laws) of
the jurisdictions in which the Company operates and the rules and regulations
applicable to the Company's business. As a public reporting company with its stock
trading on the New York Stock Exchange, the Company is also subject to regulation
by the SEC and to the applicable listing standards of the New York Stock Exchange.
For example, it is critical that each Covered Officer understand the laws, rules and
regulations applicable to disclosures the Company is required to make in its
periodic reports and otherwise . . .

104.   The Code of Ethics provides, in the section titled "Reporting Violations of this

Code," in relevant part:

If a Covered Officer believes that actions have taken place, may be taking place or
could potentially take place that violate or would or could potentially violate this
Code, including any actual or apparent conflicts of interest between personal and
professional relationships, involving any management or other employees who
have a significant role in the Company's financial reporting, disclosures or internal
controls, the Covered Officer must immediately bring this matter to the attention of
the Company's Audit Committee. A Covered Officer must also promptly bring to
the attention of the Audit Committee any information he or she may have
concerning evidence of a material violation of the securities or other laws, rules or
regulations applicable to the Company and the operation of its business, by the
Company or any agent thereof . . .

105.   Those Individual Defendants subject to the Code of Ethics, including, but not

limited to, Defendants Saltzman, Redington, and Tangen, violated the Code of Ethics by making

and/or causing the Company to make the false and misleading statements and/or omissions discussed herein and to violate applicable laws and regulations. Further, Defendants Redington and Tangen violated the Code of Ethics by engaging in insider trading.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

106.    Colony NorthStar was created by a three-way merger of Colony Capital, NAMG, and NRF (collectively, the "Predecessor Entities"), which was consummated on or about January 10, 2017.

107.    Colony NorthStar is a diversified equity REIT that includes an embedded institutional and retail investment management business.

108.    The Company divides is business into five core strategic real estate segments: Healthcare, Light Industrial, Hospitality, Other Equity and Debt, and Investment Management (collectively, the "Colony NorthStar Segments").

109.    According to the 2018 Proxy Statement, Colony NorthStar conducts "substantially all of [its] activities and hold[s] substantially all of [its] assets and liabilities through Colony Capital Operating Company, LLC" (the "Operating Company").

110.    Defendant Barrack is a director and the Executive Chairman of the Operating Company. Defendant Hamamoto was Executive Vice Chairman and director until January 11, 2018. Defendant Saltzman is its CEO and President, and Defendant Redington is its CAO. Defendants Crocker, Curtin, Fosheim, Parker, Somers, Steffens, Schoenherr, and Metz are all directors of the Operating Company.

111.    The Company externally manages Colony Credit Real Estate, Inc. f/k/a Colony

NorthStar Credit Real Estate Inc., in which it holds a 37% share. Defendants Saltzman and Tangen

are on the board of Colony Credit Real Estate, Inc.

112.    REITs provide investors with the ability to earn a share of income produced through

commercial real estate ownership without having to actually own the real estate.  For a company

to qualify as an REIT, it must have the bulk of its income and assets connected to real estate and

must distribute at least 90% of its taxable income to shareholders annually through dividends—a

significant benefit expected by REIT investors.

113.    The equity REIT industry widely utilizes a financial metric called funds from

operations.  Colony NorthStar regularly reports this financial metric, in addition to its Core FFO.

The Company calculates its funds from operations pursuant to standards established by the Board

of Governors of the National Association of Real Estate Investment Trusts, which defines FFO as

net income or loss calculated in accordance with GAAP, excluding extraordinary items, as defined

by GAAP, gains and losses from sales of depreciable real estate and impairment write-downs

associated with depreciable real estate, plus real estate-related depreciation and amortization, and

after similar adjustments for unconsolidated partnerships and joint ventures.

114.    The Company's Core FFO, adjusts the Company's funds from operations for

certain items.  More specifically, Colony NorthStar calculates its Core FFO by adjusting FFO for

the following items, including the Company's share of these items recognized by its

unconsolidated partnerships and joint ventures: (i) gains and losses from sales of depreciable real

estate within the Other Equity and Debt segment, net of depreciation, amortization and impairment

previously adjusted for FFO; (ii) effects of straight-line rent revenue and straight-line rent expense

on ground leases; (iii) amortization of acquired above- and below-market lease values; (iv) equity-

based compensation expense; (v) amortization of deferred financing costs and debt premiums and discounts; (vi) unrealized fair value gains or losses and foreign currency re-measurements; (vii) acquisition-related expenses, merger and integration costs; (viii) amortization and impairment of finite-lived intangibles related to investment management contracts and customer relationships; (ix) non-real estate depreciation and amortization; (x) change in fair value of contingent consideration; (xi) gain on re-measurement of consolidated investment entities and the effect of amortization thereof; and (xii) tax effect on certain of the foregoing adjustments.

115.    Colony NorthStar's investment management business consisted of a combination of Colony Capital's institutional investment management business, NAMG's retail investment management business, and the business of Townsend Group ("Townsend"), a global provider of investment management and advisory services focused on real estate that the Company acquired approximately 84% of in 2016 and disposed of in December 2017.  NAMG's retail investment business concentrated on earning fees through managing capital in the retail space by accessing a variety of pools of capital through various vehicles, including closed end-funds and REITS (the "Retail Companies").  The Retail Companies included the following funds: NorthStar Income, NorthStar Income II, NorthStar Healthcare, NorthStar/RXR and NorthStar Real Estate Capital Income Master Fund ("NorthStar Capital Income").

116.    Through a captive broker-dealer platform registered with the SEC called NorthStar Securities, the Retail Companies raised capital, which was reported by Colony NorthStar each quarter in addition to the investments and fees earned from the Retail Companies.

117.    During the Relevant Period, the Individual Defendants caused the Company to tout the Merger, stating that it would unlock the purportedly hidden value of the Predecessor Entities.

118.    The Merger sought to add an imbedded investment management business and the regular fees earned from managing other investors' capital to fix a perceived fundamental valuation problem.  A mere REIT was largely dependent on generating returns from capital it invested itself, which was considerably risky.  The combination with an embedded investment management business would enable the Company to earn fees from investing and managing other investors' capital while also minimizing risk.  The success of the Merger was thus in large part reliant on the contributions from the investment management business.

119.    Although the Merger was touted as potentially resulting in double the valuation of the Predecessor Entities, its ultimate success and the success of the Company would be largely impacted by the implementation of new regulations requiring increasingly transparent fee-related disclosures for non-traded REITs, such as the funds where the Company sought to seek third-party capital.  Certain rule amendments by the Financial Industry Regulatory Authority and National Association of Securities Dealers went into effect in April 2016 which mandated changes to the way non-traded REIT investment values were reported on customer account statements.  The new rules specifically required that these statements either list the security purchase price less any fees or commissions, or, in the alternative, a current value for the security.  Account statements, prior to the new rule, could merely identify a security's gross purchase price even though commissions and fees could have significantly eroded the value of it over time.  The new disclosure requirements resulted in downward pressure on fees throughout the industry and caused significant reductions in third-party fundraising.  These regulations, and the impact they would have on the Company were well known by the Individual Defendants.

120.    The Individual Defendants were aware that the new regulations requiring full disclosure of non-traded REIT fees had limited their retail fundraising potential as a result of

financial advisors leading their clients away from the Company's funds and retail investors objecting to the high fees charged by the Company.  Such fees contained a sales commission of up to 7% and other various management fees, including acquisition and disposition fees. Consequently, as the Individual Defendants were aware, the Company would not be able to raise $2 billion in capital, which was the capital raise assumption underlying announced business targets.  In reality, the Company would not be able to raise the necessary retail capital necessary for it to meet its Core FFO target and to maintain the $1.08 dividend repeatedly affirmed during the Relevant Period.

121.    Prior to the Merger, NAMG's retail investment management fees generated larger fee income that Colony Capital's institutional investment management fees.  In 2017, NAMG's retail fees represented 70% of the combined investment management fees that NAMG retail and Colony Capital institutional earned.  The Individual Defendants knew, however, that such a ratio or even one similar would not last.

122.    With the diminishing retail capital, the Company was reliant upon institutional investment management—which had lower fees and thus could not hit Core FFO or maintain a $1.08 dividend.  Indeed, institutional fees were lower than they were prior to the Merger and actually declined from 2016 to 2017 while institutional fundraising was keeping pace. Nonetheless, the mix of institutional to retail capital fundraising for 2017 was 7% retail to 93% institutional.

123.    The Individual Defendants were aware that NAMG's high fees specifically resulted in the stalling of retail fundraising.  Indeed, the Individual Defendants attempted to make their investment offerings more enticing to retail investors in February 2017 by decreasing asset management fees on the Company's NorthStar/RXR fund by approximately 20% (in addition to

eliminating all acquisition and disposition fees) and its NorthStar Capital Income fund from an annual rate of 2.0% of its average gross assets to an annual rate of 1.25% of its average daily net assets.

124.     Despite such efforts, Colony Northstar raised just $99 million in retail investment capital during the first six months of 2017, much lower than the $2 billion in fundraising that the Company stated was necessary to reach its Core FFO target.   As NAMG was historically the Company's largest contributor to the Company's fee income, Colony NorthStar's institutional investment management business (with its significantly lower fees) was not going to adequately counteract the poor retail capital fundraising results so that the Company could meet its Core FFO or dividend guidance.

125.     Further evidence that the Individual Defendants were aware they were not going to meet the guidance they reported or the $1.08 dividend is found in the sale of Townsend Group in the fourth quarter of 2017 (at a loss), which accounted for over 60% of NAMG's fee-generating assets under management at over $14 billion and had $66 million in revenues in 2016.

**Materially False and Misleading Statements**

*January 10, 2017 Press Release*

126.     On January 10, 2017, Colony NorthStar issued a press release announcing the completion of the Merger and touting the benefits arising therefrom.   In the press release, Defendant Hamamoto commented on the benefits the Merger would have on the Company's stockholders, stating, in relevant part:

> This [Merger] benefits Colony NorthStar's combined stockholders with an even stronger value proposition through enhanced relationships, substantial efficiencies and synergies and greater scale in established, durable real estate and investment management businesses with broad-based capital access and investment opportunities.

127.    Defendant Saltzman also touted the benefits stemming from the Merger, stating, in relevant part:

> We couldn't be more excited about our future prospects as we focus on recognizing the strategic benefits from combining three companies that share a singular long-term vision . . . .  Our transition planning continues to progress well and we look forward to creating a highly competitive, world-class organization that balances a creative entrepreneurial spirit with institutional best practices and risk management. I thank the leadership teams and employees of all three companies for their past efforts and continuing dedication to this transformative merger while looking forward to the significant opportunities that lie ahead for Colony NorthStar.

128.    The press release also described the Company's "World-Class Real Estate and Investment Management Platform," stating, in relevant part:

> Global, diversified equity REIT with $58 billion of assets under management, led by a seasoned management team with access to proprietary deal sourcing and a strong track record as a global investor, operator and investment manager.

129.    Additionally, the press release described the Company's "Stronger Balance Sheet and Improved Liquidity," stating, in relevant part:

> Approximately $24 billion balance sheet with significant excess liquidity expected from near-term asset monetizations which can be redeployed into new investments, to repurchase stock and/or to deleverage; targeting total debt-to-capitalization ratio of 50% or less with the goal of upgrading corporate credit profile and lowering overall cost of capital.

### *January 10, 2017 Earnings Call*

130.    On January 10, 2017, Colony NorthStar held an earnings call touting the Merger and the value that the embedded investment management business would bring to Company investors.  The earnings call noted Core FFO guidance of $1.40 – $1.58 per share with a dividend of $1.08 for the year, and that the Company anticipated covering the dividend with a "meaningful cushion."  The earnings call also noted that the Company's guidance "only assumes $2 billion of new fundraising in 2017" for the Company's investment management business.

*January 25, 2017 Form 8-K*

131.    On January 25, 2017, the Company filed a Form 8-K with the SEC, signed by Defendant Tangen, reporting Colony Northstar's previously announced sale of an interest in its healthcare real estate portfolio and commenting on the Company's healthcare portfolio, stating, in relevant part:

> On January 19, 2017, Colony NorthStar, Inc. (the "Company") completed the previously announced sale of an 18.7% interest in the Company's healthcare real estate portfolio (the "Healthcare Portfolio") to Derwood Limited ("Derwood"), in exchange for $350,000,000 (including $20,000,000 of pre-funded capital items) (the "Transaction"), pursuant to that certain purchase and sale agreement, dated as of November 4, 2016, by and among NorthStar Realty Finance Limited Partnership, NorthStar Healthcare JV Holdings, LLC, NorthStar Healthcare REIT, LLC, NorthStar TK Healthcare Operating Company, LLC, NorthStar Healthcare JV, LLC, NRFC Healthcare Holding Company, LLC and Derwood (the "Purchase Agreement").
>
> The Healthcare Portfolio is currently comprised of the Company's ownership interest, excluding existing minority interest holders, in 191 senior housing properties, 113 medical office properties, 14 hospitals and 107 skilled nursing facilities (such properties collectively referred to as the "Healthcare Properties"). The Transaction represents an implied valuation for the Healthcare Properties of approximately $5.4 billion, which excludes the portfolio of medical office buildings sold prior to the Transaction for an aggregate value of approximately $0.8 billion. The Healthcare Properties are generally operated under net leases or through management agreements with independent third-party operators.

132.    The Unaudited Pro Forma Consolidated Balance Sheet, as of September 30, 2016, which was attached to the Form 8-K, valued the Company's combined "Goodwill" at over $1 billion.

*February 28, 2017 Form 10-K*

133.    On February 28, 2017, Colony NorthStar filed its annual report on Form 10-K with the SEC announcing financial results for the quarter and year ended December 31, 2016 (the "2016 10-K"), signed by each of the Individual Defendants. The 2016 10-K announced the Company's annual financial results and position.

134.    The 2016 10-K discussed the Colony NorthStar Segments, including Healthcare

and Investment Management, stating, in relevant part:

> _Colony NorthStar Segments_
> Our business objective is to provide attractive risk-adjusted returns to our investors
> through five core strategic real estate segments summarized as follows:
>
> - _Healthcare_ - Our healthcare properties are comprised of a diverse portfolio
>   of medical office buildings, senior housing, skilled nursing and other
>   healthcare properties. Over half of our healthcare properties are medical
>   office buildings and properties structured under a net lease to healthcare
>   operators. Substantially all of our net leases include annual escalating rent
>   provisions. In addition, our portfolio consists of senior housing operating
>   facilities which include healthcare properties that operate through
>   management agreements with independent third-party operators,
>   predominantly through structures permitted by the REIT Investment
>   Diversification and Empowerment Act of 2007, or RIDEA, structures that
>   permit us, through a taxable REIT subsidiary, or TRS, to have direct
>   exposure to resident fee income and incur customary related operating
>   expenses. Our medical office buildings are a combination of single tenant
>   and multi-tenant properties typically structured with long-term leases with
>   the tenants.
>
> \* \* \*
>
> - _Investment Management_ - Our investment management business is
>   expected to generate fee income through investment management services,
>   sponsoring numerous investment products across a diverse set of
>   institutional and retail investors.

135.    The 2016 10-K provided financial results for each of the Predecessor Entities,

including capital raising information for NAMG, which, after the Merger, formed part of the

Company's investment management segment.  The 2016 10-K provided a summary table of the

Retail Companies which contained capital raising activity and investments through February 23,

2017, noting that only two of the Retail Companies, NorthStar/RXR and NorthStar Capital

Income, had an active offering period.  The summary table also specifically noted that the

Company "expects the capital raise to accelerate in 2017" for NorthStar/RXR.  The summary table

was provided as follows:

*Retail Companies*

The following table presents a summary of the Retail Companies, including capital raise activity and investments as of or through February 23, 2017:

| Retail Company | Primary Strategy | Offering Amount (in millions)[1] | Offering Period | Capital Raised (in millions)[1] | Total Investments (in millions) |
|---|---|---|---|---|---|
| **Effective** | | | | | |
| NorthStar Income | CRE Debt | $ 1,200.0 | Completed July 2013 | $ 1,293.4 | $ 1,599.9 |
| NorthStar Healthcare | Healthcare Equity and Debt | 2,100.0 | Completed January 2016[2] | 1,880.8 | 3,413.7 |
| NorthStar Income II | CRE Debt | 1,650.0 | Completed November 2016[2] | 1,145.5 | 1,739.8 |
| NorthStar/RXR New York Metro[3] | New York Metro Area CRE Equity and Debt | 2,000.0 | Ends February 2018[4][5] | 12.8 [9] | 11.0 |
| NorthStar Capital Fund | CRE Debt and Equity | 3,200.0 [6] | Ends July 2019[5][7] | 2.2 [9] | 0.1 |
| **Not Yet Effective** | | | | | |
| NorthStar/Townsend Investment | CRE Debt and Equity | $ 1,000.0 | N/A[8] | N/A | N/A |

(1)     Represents amount of shares registered and raised to offer pursuant to each Retail Company's public offering, distribution reinvestment plan and follow-on public offering.

(2)     NorthStar Healthcare successfully completed its initial public offering on February 2, 2015 by raising $1.1 billion in capital and its follow-on public offering on January 19, 2016 by raising $0.7 billion in capital. NorthStar Income II closed its initial public offering on November 9, 2016 and raised $1.1 billion in capital.

(3)     Any asset management and other fees incurred by NorthStar/RXR New York Metro will be shared equally between NSAM and RXR Realty, as co-sponsors.

(4)     NorthStar/RXR New York Metro's registration statement became effective in 2015 and began raising capital in 2016. Colony NorthStar expects the capital raise to accelerate in 2017.

(5)     Offering period subject to extension as determined by the board of directors or trustees of each Retail Company.

(6)     Offering is for two feeder funds in a master feeder structure.

(7)     NorthStar Capital Fund's registration statement was declared effective by the SEC in May 2016. Colony NorthStar expects NorthStar Capital Fund to begin raising capital from third parties in the first half 2017.

(8)     NorthStar/Townsend Investment submitted a registration statement on Form N-2 to the SEC in October 2016. Colony NorthStar expects NorthStar/Townsend Investment to begin raising capital in the first half 2017.

(9)     In connection with the distribution support agreement with each Retail Company, an affiliate of Colony NorthStar purchased shares of common stock in NorthStar/RXR New York Metro and NorthStar Capital Fund for $1.5 million and $2.0 million, respectively, since inception through December 31, 2016.

136.    Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Saltzman and Tangen attesting to the accuracy of the 2016 10-K.

*February 28, 2017 Press Release*

137.    On the same day, the Company issued a press release also attached as an exhibit to a Form 8-K filed with the SEC and signed by Defendant Tangen, titled "Colony NorthStar Announces Fourth Quarter 2016 Financial Results and Post-Merger Update," which announced fourth quarter 2016 results for the Predecessor Entities. The release revealed that the Company was reducing "Core FFO [funds from operations] guidance for the year ending 2017 to a range of $1.40 to $1.58 per share," which was a reduction from the Company's previous per share guidance of $1.55 to $1.75 and was attributed to a special dividend paid to NAMG shareholders as part of the Merger and to lower third-party capital raising.  Moreover, the press release stated that the Company "does not intend to provide updates to Core FFO guidance going forward."

138.   As to the reduction in Core FFO guidance, the press release stated, in relevant part:

The Company is updating its Core FFO guidance for the year ending 2017 to a range of $1.40 to $1.58 per share, but does not intend to provide updates to Core FFO guidance going forward.  In comparison to the original 2017 guidance that was provided in the Investor Presentation related to the merger filed on June 7, 2016, the update includes lower earnings due primarily to: 1) less third party capital raising; 2) less cash available to deploy into investments resulting from the increase of the NSAM special dividend among other reasons; and, 3) accelerating the replacement of higher-yielding, non-core investments with lower-yielding investments that better fit the strategic direction of the Company.

139.   In the press release, Defendant Saltzman commented on the Company's focus on "realizing the many benefits" arising from the Merger, stating, in relevant part:

With the tri-party merger closing last month now behind us, we're focused completely on realizing the many benefits of significantly improved scale and capabilities all efficiently housed under one roof. Simultaneously, our aim is to simplify our portfolio investments and business lines as quickly as possible. The resultant streamlined organization will be a leading diversified equity REIT with a concentration in select areas demonstrating the most favorable supply/demand dynamics globally that further benefits from an embedded best-in-class investment management operation. We expect to make substantial progress towards this goal during 2017 and have all of this in place no later than the end of next year.

### *February 28, 2017 Investor Presentation*

140.   The Form 8-K attached as an exhibit an investor presentation that touted the benefits of the Merger, including through the investment management segment.  The presentation noted a near-term priority in the investment management segment which included "accelerat[ing] fundraising in new retail vehicles."

### *March 1, 2017 Conference Call*

141.   On March 1, 2017, the Company held an earnings call to discuss the Company's 2016 financial results, during which Defendant Saltzman reaffirmed Colony NorthStar's 2017 Core FFO guidance, stating that the Company "anticipated core FFO earnings [in the] range of $1.40 to $1.58 per share."  Saltzman further noted that it was decreased by just under 10% as a

result of a special dividend paid to NAMG shareholder in completing the Merger, a redeployment of capital into lower yielding core strategic assets, and a reduction of capital raised in 2016. Defendant Saltzman also noted that the guidance provided "assumes $2 billion of new fundraising in 2017."

142.    Also during the call, Defendant Saltzman was asked by an analyst about the "breakdown of retail versus institutional" in the $2 billion capital raise assumption, to which he responded that "we haven't been transparent about that," and stating merely that "there is a mix" of the two.  The exchange was as follows:

[Analyst]

Got you.  And with regard to the capital raising, I think you said $2 billion versus $1 billion last year.  Is there a breakdown of retail versus institutional in terms of how that $2 billion is comprised?

[Defendant Saltzman]

Well, we haven't been transparent about that, so yes, there is a mix of institutional and retail.  I'm probably not going to comment on it per se at this point.

143.    During the call, Defendant Saltzman noted "headwinds in 2016" in both retail and institutional capital raising and that the Company was experiencing "momentum" in both. Defendant Saltzman further noted that if the "momentum" continued, they could be "very pleasantly surprised" on both fronts.  Defendant Saltzman specifically stated:

In terms of capital raises, we experienced headwinds in 2016 on both the institutional and retail fronts . . . .

* * *

Fortunately, the tide appears to have turned for both institutional and retail placements based upon the momentum we're now experiencing in both markets. In fact, our guidance only assumes $2 billion of new fundraising in 2017.  If momentum continues to build, this is an area where we could be very pleasantly surprised.

* * *

But I think, consistent with my comments earlier, I think we're pretty sanguine and cautiously optimistic about how we're likely to do better in terms of capital raising this year.  We were very disappointed with where we ended up last year for the reasons that I mentioned.  But I think now that we're stabilized, the merger is behind us, the environment is as positive as it is, and we have all of these interesting opportunities in terms of both the existing balance sheet as well as what we're doing on the investment management side, I'd be very surprised if we don't exceed that for this year.

144.   During the call, Defendant Tangen addressed investor concerns surrounding the Company's reduction in Core FFO guidance following the highly touted Merger.  Tangen noted that the Company's dividend was not in danger because Colony NorthStar's "new core FFO guidance more than covers our new annual dividend of $1.08 per share."

145.   Defendants Saltzman also used the call to further tout the benefits of the Merger by noting its accretive nature and the ability of the investment management business to "turbocharge growth and returns," stating, in relevant part:

As we've discussed previously, the balance sheet of Colony NorthStar will be organized in a series of from three to five core property verticals that are each easy to understand and valued from a public market's perspective.  The commonality will be very favorable supply/demand fundamentals for the particular real estate asset class, along with an ability to raise third-party outside capital with investment management economics.

The latter at an ultimate ratio of at least 2 to 1 outside to inside capital is intended to turbocharge growth and returns, as you see today in single-sector-focused equity REITs with embedded investment management platforms.

***The 2017 Proxy Statement***

146.   On March 29, 2017, Colony Northstar filed the 2017 Proxy Statement with the SEC.  Defendants Barrack, Hamamoto, Crocker, Curtin, Fosheim, Metz, Parker, Schoenherr,

Somers, and Steffens solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[11]

147.   The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, "our Board of Directors has adopted a written set of corporate governance guidelines, a code of business conduct and ethics and a code of ethics for our principal executive officers and senior financial officers."

148.   The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by certain of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

149.   The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

150.   The 2017 Proxy Statement also failed to disclose that: (1) the Company's capital fundraising was not accelerating or gaining momentum; (2) the Company's funds would not be able to raise retail funds sufficient to contribute materially to the Company's financial results; (3) the Company was being negatively impacted by new regulations regarding the disclosure of investment management fees, and the effect it had on the collection of fees, to a greater extent than portrayed; (4) the Company's retail investment management business was not substantially

---

[11] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

contributing to the Company's target capital fundraising amount; (5) the Company would not meet its Core FFO and dividend guidance; (6) the overall performance of Company, including specifically its Healthcare and Investment Management segments, was weaker than had been reported; and (7) the Company failed to maintain internal controls.

### May 9, 2017 Press Release & Form 8-K

151.    On May 9, 2017, Colony NorthStar issued a press release also attached as an exhibit to a Form 8-K filed with the SEC and signed by Defendant Tangen, announcing the Company's financial results for the first fiscal quarter ended March 31, 2017.  In the press release, Colony NorthStar reported Core FFO of $173.1 million, or $0.31 per share, for the quarter, which was 17% below the midpoint of the 2017 Core FFO guidance.

152.    Defendant Saltzman assured investors in the press release that "[w]e remain on track to achieve our 2017 full year goals for Core FFO including synergies, new investor client capital formation, and simplification; notwithstanding some seasonal and other timing related performance differences in the first quarter."

### May 10, 2017 Form 10-Q

153.    On May 10, 2017, Colony NorthStar filed a quarterly report for the first fiscal quarter 2017 on Form 10-Q (the "Q1 2017 10-Q") providing the Company's quarterly financial results and position. The Q1 2017 10-Q was signed by Defendants Saltzman, Tangen, and Redington.

154.    The Q1 2017 10-Q discussed the Colony NorthStar Segments, stating, in relevant part:

- *Healthcare* - The Company's healthcare segment is composed of a diverse portfolio of medical office buildings, senior housing, skilled nursing and other healthcare properties. The Company earns rental income from medical office buildings and properties structured under net leases to healthcare

operators, and resident fee income from senior housing operating facilities that operate through management agreements with independent third-party operators.

\* \* \*

- *Investment Management* - The Company generates fee income through investment management services, sponsoring numerous investment products across a diverse set of institutional and retail investor.

155.    The Q1 2017 10-Q further described the Healthcare segment, stating, in relevant

part:

### *Healthcare*

Our healthcare segment is composed of a diverse portfolio of medical office buildings, senior housing, skilled nursing and other healthcare properties. Over half of our healthcare properties are medical office buildings and properties structured under net leases to healthcare operators for which we earn rental income. Substantially all of our net leases include annual escalating rent provisions. We also earn resident fee income from senior housing operating facilities that operate through management agreements with independent third-party operators, predominantly through structures permitted by RIDEA, which allows us, through a TRS, to have direct exposure to resident fee income and incur customary related operating expenses.

In connection with our on-going sales initiative, subsequent to the Merger, we closed on the sale of an 18.7% noncontrolling interest in our healthcare real estate portfolio through a newly formed joint venture for $350 million (including $20 million of certain pre-funded capital items). Our healthcare joint venture in turn owns approximately 87.7% of our healthcare portfolio, with the remaining 12.3% owned by existing minority interest holders. We act as the manager of our healthcare joint venture and are responsible for the day-to-day business and affairs of our healthcare portfolio.

At March 31, 2017, our interest in our healthcare segment was approximately 71.3%.

Our healthcare portfolio is located across 33 states domestically and 10% of our portfolio (based on facility count) is in the United Kingdom.

The following table presents selected operating metrics of our healthcare segment at March 31, 2017:

| Type | Number of Properties / Facilities | Capacity | | Average Occupancy [1] | Average Remaining Lease Term (Years) | NOI for the Three Months Ended March 31, 2017 (in thousands) |
|---|---|---|---|---|---|---|
| Medical office buildings | 113 | 4.02 million | square feet | 85.1% | 5.1 | $ 11,974 |
| Senior housing— operating | 109 | 6,436 | units | 86.8% | NA | 16,314 |
| Net lease— senior housing | 82 | 4,065 | units | 85.7% | 11.5 | 12,461 |
| Net lease— skilled nursing facilities | 107 | 12,794 | beds | 84.2% | 7.6 | 25,384 |
| Net lease— hospitals | 14 | 817 | beds | 60.9% | 12.0 | 4,995 |
| Total | 425 | | | 83.6% | 9.5 | $ 71,128 |

\* \* \*

Subsequent to the Merger, we sold one medical office building for net proceeds of $3.1 million. At March 31, 2017, we had one portfolio and two skilled nursing facilities held for sale, with an aggregate real estate carrying value of $228.6 million and corresponding debt carrying value of $150.7 million. These activities reflect our continued asset monetization initiatives.

(Footnote omitted.)

156.    The Q1 2017 10-Q further described the Investment Management segment, and

NAMG's contributions thereto, stating, in relevant part:

***Investment Management***

We manage capital on behalf of third party institutional and retail investors through private funds, traded and non-traded REITs and investment companies, which provide a stable stream of management fee income. We also have an embedded broker-dealer platform which raises capital in the retail market.

Our investment management platform allows us to raise private third party capital in partnership with our own balance sheet to further scale our core real estate segments and also allows us to pursue a balance sheet light tactical strategy.

For the three months ended March 31, 2017, we closed on approximately $980 million of third party capital commitments, with $940 million from institutional

clients and $40 million from retail clients.

Total third party assets under management ("AUM") were as follows:

| (In billions) | March 31, 2017 | December 31, 2016 |
|---|---|---|
| Third party AUM [1] | $40.7 | $10.7 |

The acquisition of NSAM's investment management business contributed $30.9 billion of our third party AUM at March 31, 2017. In the first quarter of 2017, Colony's third party AUM decreased approximately $0.9 billion, due to continued realization of investments by liquidating funds, including the sale of shares in Colony Starwood Homes held by our managed funds, partially offset by new capital raised during this period.

Our third party AUM at March 31, 2017 by type is summarized below:

| Type | Products | Description | AUM (in billions) |
|---|---|---|---|
| Institutional Funds | Credit funds, opportunistic funds, value-add funds, Colony industrial open end fund, other co-investment vehicles and special accounts | Earns base and asset management fees, potential for incentives on sponsored funds | $  10.2 |
| Retail Companies | Colony NorthStar Income I, Colony NorthStar Income II | Public non-traded REITs and investment companies | 7.0 |
| | Colony NorthStar Healthcare | Broker-dealer subsidiary acts as dealer-manager for all retail product offerings | |
| | Colony NorthStar/RXR NY Metro [1] Colony NorthStar Capital Fund Colony NorthStar/Townsend [1] [2] | Earns base management fees from all Retail Companies, acquisition and disposition fees from non-traded REITs (except for Colony NorthStar/RXR NY Metro), and potential for performance fees (except for Colony NorthStar/Townsend) | |
| Public Companies | Colony NorthStar Realty Europe Corp. | NYSE-listed European equity REIT | 2.0 |
| | | Earns base management fees, potential for incentives | |
| Townsend | Commingled funds, segregated mandates, advisory services | 84% interest in Townsend group | 14.5 |
| | | Manage fund-of-funds and custom portfolios primarily invested in direct real estate funds | |
| | | Source co-investments and joint ventures alongside GPs | |
| | | Earns base management fees, performance fees, advisory fees | |
| Pro Rata | Joint venture investments | Earns share of earnings from | 7.0 |

| **Corporate Investments** | unconsolidated ventures |
| | Includes investments in RXR Realty (27%), real estate owner, developer and asset manager with AUM over $12 billion; and (ii) AHI (43%), healthcare asset manager and sponsor of non-traded vehicles with AUM of $2.5 billion |
| | <u>$   40.7</u> |

(Footnote omitted.)

157.    Attached to the Q1 2017 10-Q were SOX certifications signed by Defendants Saltzman and Tangen, attesting to the accuracy of the Q1 2017 10-Q.

### *May 10, 2017 Earnings Call*

158.    Also on May 10, 2017, the Company held an earnings call to discuss its first quarter 2017 financial results.  During the call, Defendant Saltzman affirmed that the Company remained on track to achieve its full year Core FFO guidance, stating, in relevant part:

> Our core FFO for the quarter was $0.31 per share, which Darren will discuss in greater detail on this call.  This result reflects the seasonality of our hospitality segment as well as other timing differences, and we remain on track to achieve our 2017 full year goals for core FFO.  For example, the first quarter did not reflect the full impact of capital raising and investments that occurred during the quarter, including our common stock repurchases, which generally happen later in the quarter or subsequent to quarter end.

159.    Moreover, Defendant Saltzman noted, "consistent with the updated earnings guidance range from last quarter, we anticipate that 2017 core FFO will cover the annual dividend by a meaningful cushion."

160.    Also during the call, Defendant Tangen noted that the Company's full year Core FFO guidance was conservative because "[a]dditional core FFO upside exits" and that one example of such upside was "certainly" retail investment management.  Defendant Tangen, stated, in relevant part:

> Results, which we do not consider as representative of the company's stabilized earnings potential.  Notably, the seasonal impact of our hospitality business in the

first quarter was approximately $0.02 per share, which is the difference between actual Q1 results and the simple quarterly average based on expected results in this segment over the calendar year. Furthermore, if we apply the forecast $80 million cash G&A synergy benefit and the stock repurchases, which happened in the past 2 months, core FFO would have been a further (technical difficulty) per share higher. Additional core FFO upside exists from reaching full capital deployment and expected ramp up over the course of the year from other investments and businesses, including retail investment management. For these reasons, we believe we remain on track to achieve the full year 2017 core FFO guidance range presented on our last call.

161.    During the call, Defendant Tangen further commented on Core FFO upside and the

upside of retail investment management, stating, in relevant part:

I didn't give a number but we do expect further core FFO upside from achieving full capital deployment, which we certainly didn't have in the first quarter as well as there are certain businesses and even other assets that we expect will have improved operating performance over the course of the year. And retail investment management is certainly one example of that, for some of the reasons that Richard mentioned during his remarks.

162.    Defendant Saltzman also used the call to falsely portray "positive momentum" in

the "improving" retail investment management channel and the "best-in-class" nature of the

Company's offerings. Saltzman also touted the Company's new retail company offering obtained

from then Townsend Group, despite that Colony NorthStar was trying to sell it off. Defendant

Saltzman stated, in relevant part:

Turning to our retail platform. After an extended period of extraordinary market disruption mainly driven by significant regulatory changes, we are finally seeing positive momentum in the overall retail marketplace as well as in our own fundraising. We've positioned our retail platform and product lineup to take full advantage of the evolving market environment and to support our goals of broadening the pool and channels of capital we access, which now includes registered investment advisers and traditional Wall Street firms, in addition to the historical network of independent broker-dealers, all with an objective of bringing Colony NorthStar's institutional asset management acumen and best practices to the retail investor client. And post merger, this includes using our balance sheet to foster better alignment of interest with investors. Our offerings include nontraded REITs and 40 Act funds allowing us to serve both long-term existing relationships and targeted new pools of capital. Product structures are innovative and best-in-class, well suited to the new market environment and reflect our drive to be a visionary value-producing leader in the marketplace.

In connection therewith, we've seen strong progress in building the selling groups in our current offerings and a commensurate acceleration in the pace of fundraising. More than $6 billion of targeted capital is anticipated to be raised in products that are generally early in their life cycles and just starting the capital raising process, including our 2 effective programs the $2 billion NorthStar/RXR New York Metro real estate nontraded REIT and a $3.2 billion NorthStar Real Estate Capital Income 40 Act closed-end fund, as well as our soon-to-be effective $1 billion NorthStar/Townsend Institutional Real Estate 40 Act interval fund.  Privately placed retail products, or institutional funds that have a retail sleeve, are also in various stages of development.  All of these are structured to be highly attractive to a very broad group of financial advisers and their clients.

163.    Also during the call, Defendant Saltzman was asked about the environment for capital raising in the investment management business, to which he responded:

And then I think the retail environment, as I suggested in my remarks, I think is improving.  And now that we've got these regulatory headwinds behind us, I think is more open-minded about getting invested again in the space.  And I think the variety of offerings that we have before them represent a very attractive menu of choices that hopefully, they will participate in.

164.    Defendant Saltzman further noted during the call that the positive momentum in the retail channel would lead to "incremental" results for retail fundraising in the following quarter and that the Company was "more likely to be robust on our behalf during the second half of the year and then going into 2018."

### June 22, 2017 JPM Securities Financial Services and Real Estate Conference

165.    On June 22, 2017, the Company participated in the JPM Securities Financial Services and Real Estate Conference, during which Defendant Saltzman continued to suggest that the Company would meet its financial guidance.  At the Conference, Defendant Saltzman stated, in relevant part:

So today, we feel very comfortable with the $1.08 per annum dividend yield level that we've set.  And the [Core FFO] guidance that we've provided . . . currently the midpoint of that guidance is around $1.49 per share.  So very substantial and adequate coverage around that $1.08 dividend.  But when you peel the onion back, what people want to ask us about is that with respect to the $1.49, Colony Capital

since its inception going public back in 2009 has very consistently generated maybe 20%, 25% of its earnings through gains that have been recurring because these were opportunistic investments that we made at the depths of the financial crisis . . . . So today as a combined entity, Colony NorthStar, we're continuing to tell people probably 15% to 20% of our core FFO is going to be recurring gains . . . [a]nd first of all, if you take 15% to 20% away from $1.49, you're still covering the $1.08. So the cushion is not quite as large, of course, but you're still covering it. So that's why we're so confident around that number, it's covered by our true recurring income. But then our objective is to replace what's burning off in terms of gains and replace it with more investment management economics, primarily base investment management fees through incremental capital raises that we're going to be able to do in all of these various constructs that we're describing.

### August 8, 2017 Form 8-K and Press Release

166.    On August 8, 2017, Colony NorthStar issued a press release also attached to a Form 8-K filed with the SEC and signed by Defendant Tangen, announcing the Company's financial results for the second fiscal quarter ended June 30, 2017. The press release reported, *inter alia*, Core FFO of $203.6 million, or $0.35 per basic share, for the quarter.

### August 9, 2017 Form 10-Q

167.    On August 9, 2017, Colony NorthStar filed a quarterly report for the second fiscal quarter 2017 on Form 10-Q (the "Q2 2017 10-Q") providing the Company's quarterly financial results and position. The Q2 2017 10-Q was signed by Defendants Saltzman, Tangen, and Redington.

168.    Q2 2017 10-Q discussed the Healthcare segment, including the Company's desire to sell certain assets within the segment, stating, in relevant part:

In connection with our on-going sales initiative, subsequent to the Merger, we closed on the sale of an 18.7% noncontrolling interest in our healthcare real estate portfolio through a newly formed joint venture for $350 million (including $20 million of certain pre-funded capital items). Our healthcare joint venture in turn owns approximately 87.7% of our healthcare portfolio, with the remaining 12.3% owned by existing minority interest holders. We act as the manager of our healthcare joint venture and are responsible for the day-to-day business and affairs of our healthcare portfolio.

At June 30, 2017, our interest in our healthcare segment was approximately 71.3%.

Our healthcare portfolio is located across 33 states domestically and 10% of our portfolio (based on property count) is in the United Kingdom.

The following table presents selected operating metrics of our healthcare segment:

| Type | Number of Buildings at June 30, 2017 | Capacity at June 30, 2017 | Average Occupancy[1] | Average Remaining Lease Term (Years) | NOI for the Three Months Ended June 30, 2017 (In thousands) | NOI for the Six Months Ended June 30, 2017 (In thousands) |
|---|---|---|---|---|---|---|
| Medical office buildings | 113 | 4.02 square million feet | 84.0% | 5.0 | $ 14,408 | $ 26,382 |
| Senior housing—operating | 109 | 6,436 units | 86.7% | N/A | 19,418 | 35,732 |
| Net lease—senior housing | 82 | 4,065 units | 83.6% | 11.3 | 14,407 | 26,868 |
| Net lease—skilled nursing facilities | 107 | 12,794 beds | 83.4% | 7.7 | 24,904 | 50,288 |
| Net lease—hospitals | 14 | 872 beds | 63.4% | 11.9 | 5,375 | 10,370 |
| Total | 425 | | 83.0% | 9.4 | $ 78,512 | $ 149,640 |

\* \* \*

Subsequent to the Merger, we sold one medical office building for net proceeds of $3.1 million. At June 30, 2017, we had one portfolio, five medical office buildings and two skilled nursing facilities held for sale, with an aggregate real estate carrying value of $228.8 million and corresponding debt carrying value of $168.7 million. These activities reflect our continued asset monetization initiatives.

(Footnote omitted.)

169.     The Q2 2017 10-Q further described the Investment Management segment, and NAMG's contributions thereto, stating, in relevant part:

*Investment Management*

We manage capital on behalf of third party institutional and retail investors through private funds, traded and non-traded REITs and investment companies, which

provide a stable stream of management fee income. We also have an embedded broker-dealer platform which raises capital in the retail market.

Our investment management platform allows us to raise private third party capital in partnership with our own balance sheet to further scale our core real estate segments and also allows us to pursue a balance sheet light tactical strategy.

For the six months ended June 30, 2017, we closed on approximately $1.4 billion of third party capital commitments, including our pro rata share from equity method investments in third party asset managers.

Our total third party assets under management ("AUM") were as follows:

| (In billions) | June 30, 2017 | December 31, 2016 |
|---|---|---|
| Third party AUM [1] | $40.3 | $10.7 |

The acquisition of NSAM's investment management business contributed $30.7 billion of our third party AUM at June 30, 2017. In the six months ended June 30, 2017, Colony's third party AUM decreased $1.1 billion, due to continued realization of investments by liquidating funds, including the sale of shares in SFR held by our managed funds.

Our third party AUM at June 30, 2017 by type is summarized below:

| Type | Products | Description | AUM (in billions) |
|---|---|---|---|
| Institutional Funds | Credit funds, opportunistic funds, value-add funds, Colony industrial open end fund, other co-investment vehicles and special accounts | Earns base and asset management fees, potential for incentives on sponsored funds | $ 10.0 |
| Retail Companies | Colony NorthStar Income I, Colony NorthStar Income II | Public non-traded REITs and investment companies | 6.9 |
| | Colony NorthStar Healthcare | Broker-dealer subsidiary acts as dealer-manager for all retail product offerings | |
| | Colony NorthStar/RXR NY Metro [1] Colony NorthStar Capital Fund Colony NorthStar/Townsend [1][2] | Earns base management fees from all retail companies, acquisition and disposition fees from non-traded REITs (except for Colony NorthStar/RXR NY Metro), and potential for performance fees (except for Colony NorthStar/Townsend) | |
| Public Companies | Colony NorthStar Realty Europe Corp. | NYSE-listed European equity REIT Earns base management fees, potential for incentives | 2.1 |
| Townsend [3] | Commingled funds, segregated mandates, advisory services | 84% interest in Townsend group Manage fund-of-funds and custom portfolios primarily invested in direct real estate funds | 14.2 |

| | | | |
|---|---|---|---|
| | | Source co-investments and joint ventures alongside GPs | |
| | | Earns base management fees, performance fees, advisory fees | |
| **Pro Rata Corporate Investments** | Joint venture investments | Earns share of earnings from unconsolidated ventures | 7.1 |
| | | Includes investments in RXR Realty (27% interest), a real estate owner, developer and asset manager with AUM over $12 billion; and AHI (43% interest), a healthcare asset manager and sponsor of non-traded vehicles with AUM of $2.9 billion | |
| | | | $  40.3 |

(Footnote omitted.)

170.    Attached to the Q2 2017 10-Q were SOX certifications signed by Defendants Saltzman and Tangen, attesting to the accuracy of the Q2 2017 10-Q.

### August 9, 2017 Earnings Call

171.    Also on August 9, 2017, the Company held an earnings call to discuss its second quarter 2017 financial results, during which Defendant Saltzman reaffirmed that Colony NorthStar's dividend "will be well covered by our 2017 core FFO."  Saltzman also commented on the Company's retail investment management business during the call, noting purported "industry challenges."   Nonetheless, Defendant Saltzman commented that Colony NorthStar "remain[ed] optimistic" that it "will continue to institutionalize and rebound," stating, in relevant part:

> On the other hand, an extended period of extraordinary structural change and market disruption, including the very recent Department of Labor fiduciary for adoption and implementation in June, has negatively impacted the retail investment management business year-to-date.  Despite these industry challenges, we remain optimistic that the retail investment management business will continue to institutionalize and rebound.

172.    Defendant Saltzman also noted that the retail market was stabilizing from regulatory headwinds and that there would be growth in the retail channel in the second half of 2017, stating, in relevant part:

The majority of our fundraising year-to-date has been sourced from institutional clients, and we expect this trend to continue through the balance of the year as the retail market stabilizes from the regulatory headwinds previously described and starts to grow again during the second half of 2017 and into 2018 and beyond.

173.    Also during the call, Defendant Saltzman continued to tout the Merger and the

Company's investment management platform, stating, in relevant part:

Our investment management platform, with $40 billion of assets under management, inclusive of $14 billion of AUM within our accounts and subsidiary, supports our core real estate verticals by leveraging our current asset level returns with investment management fees and carried interest, the turbocharged financial model without incremental financial risks.

### November 9, 2017 Press Release

174.    On November 9, 2017, Colony NorthStar issued a press release also attached as an

exhibit to a Form 8-K filed with the SEC, and signed by Defendant Tangen, announcing the

Company's financial results for the fiscal third quarter ended September 30, 2017.  The press

release announced Core FFO of $193.4 million, or $0.33 per basic share, for the quarter, and that

the Company's reported Core FFO by the end of the third quarter implied a run rate of

approximately $1.25 for the 2017 fiscal year, which was below the midpoint of its guidance with

one quarter remaining in the fiscal year.

### November 9, 2017 Form 10-Q

175.    On November 9, 2017, Colony NorthStar filed a quarterly report for the third

quarter 2017 on Form 10-Q (the "Q3 2017 10-Q") providing the Company's quarterly financial

results and position. The Q3 2017 10-Q was signed by Defendants Saltzman, Tangen, and

Redington.

176.    Q3 2017 10-Q discussed the Healthcare segment, including the Company's desire

to sell certain "non-core" assets within the segment, stating, in relevant part:

In connection with our on-going sales initiative, subsequent to the Merger, we closed on the sale of an 19% noncontrolling interest in our healthcare real estate portfolio through a newly formed joint venture for $350 million (including $20 million of certain pre-funded capital items). Our healthcare joint venture in turn owns approximately 88% of our healthcare portfolio, with the remaining 12% owned by existing minority interest holders. We act as the manager of our healthcare joint venture and are responsible for the day-to-day business and affairs of our healthcare portfolio.

At September 30, 2017, our interest in our healthcare segment was approximately 71%.

Our healthcare portfolio is located across 33 states domestically and 10% of our portfolio (based on property count) is in the United Kingdom.

The following table presents selected operating metrics of our healthcare segment:

| Type | Number of Buildings at September 30, 2017 | Capacity at September 30, 2017 | Average Occupancy[1] | Average Remaining Lease Term (Years) | NOI for Three Months Ended September 30, 2017 (In thousands) | NOI for Nine Months Ended September 30, 2017 (In thousands) |
|---|---|---|---|---|---|---|
| Medical office buildings | 109 | 3.9 square million feet | 83.5% | 4.9 | $ 13,843 | $ 40,225 |
| Senior housing—operating | 109 | 6,436 units | 87.8% | N/A | 18,704 | 54,436 |
| Net lease—senior housing | 82 | 4,065 units | 82.3% | 11.1 | 14,638 | 41,506 |
| Net lease—skilled nursing facilities | 103 | 12,420 beds | 82.1% | 7.2 | 25,513 | 75,801 |
| Net lease—hospitals | 14 | 872 beds | 61.5% | 11.7 | 5,304 | 15,674 |
| Total | 417 | | 82.9% | 9.0 | $ 78,002 | $ 227,642 |

* * *

Subsequent to the Merger, we sold five medical office buildings totaling 0.2 million square feet and four skilled nursing facilities totaling 374 beds for aggregate net proceeds of $2.8 million. At September 30, 2017, we had one portfolio, one

medical office building and four skilled nursing facilities held for sale, with an aggregate real estate carrying value of $197.5 million and corresponding debt carrying value of $143.4 million. These activities reflect our continued monetization initiatives on non core assets.

(Footnote omitted.)

177.    The Q3 2017 10-Q described the Company's Investment Management segment, including NAMG's contributions thereto, stating, in relevant part:

### Investment Management

We manage capital on behalf of third party institutional and retail investors through private funds, traded and non-traded REITs and investment companies, which provide a stable stream of management fee income. We also have an embedded broker-dealer platform which raises capital in the retail market.

Our investment management platform allows us to raise private third party capital in partnership with our own balance sheet to further scale our core real estate segments and also allows us to pursue a balance sheet light tactical strategy.

For the nine months ended September 30, 2017, we closed on approximately $1.7 billion of third party capital commitments, including our pro rata share from equity method investments in third party asset managers.

Our total third party assets under management ("AUM") were as follows:

| (In billions) | September 30, 2017 | December 31, 2016 |
|---|---|---|
| Third party AUM [(1)] | $41.7 | $10.7 |

The acquisition of NSAM's investment management business, including Townsend and NSAM's investments in third party asset managers, contributed $31.5 billion of our third party AUM at September 30, 2017. Colony's third party AUM of $10.2 billion at September 30, 2017 decreased $0.4 billion from December 31, 2016 due to continued realization of investments by liquidating funds, including the sale of shares in SFR held by our managed funds, partially offset by the July 2017 acquisition of the THL Hotel Portfolio which is co-invested with our managed funds, as well as the acquisition and subsequent syndication of a California office building investment to third party investors in September 2017.

(Footnote omitted.)

178.    Attached to the Q3 2017 10-Q were SOX certifications signed by Defendants Saltzman and Tangen, attesting to the accuracy of the Q3 2017 10-Q.

***November 9, 2017 Earnings Call***

179.    Also on November 9, 2017, Colony NorthStar held an earnings call to discuss its

third quarter 2017 financial results, during which Defendant Saltzman stated that the Company

had "another excellent quarter of strategic accomplishments at Colony NorthStar" and touted the

investment management business's ability to fill the gap between targeted Core FFO and actual

results, stating, in relevant part:

> In terms of operating performance for the quarter, we generated core FFO of $193
> million or $0.33 per share, which covered our dividend of $0.27 per share after
> adjusting for $0.06 per share of net gain contribution in the quarter.  A solid
> quarterly result, but admittedly, cumulative year-to-date core FFO has been below
> our beginning of the year target.  As we invest on more than $1 billion of dry
> powder and grow our investment management business through complementary
> coinvesting and related fund placements, we expect to fill that gap over time.

180.    During the third quarter the Company sold the Townsend Group's $15 billion

business, which the Company had just recently acquired, for a "modest loss," resulting in an

analyst asking about Colony NorthStar's ability to fundraise outside third-party capital.   The

exchange between this analyst and Defendant Saltzman was as follows:

> [Analyst]
>
> Okay.  So probably, just it's as usual dependent upon opportunities and whatnot.
> But maybe just specifically on kind of the third-party asset under management side
> of the equation, do you have any bigger-picture thoughts or just kind of same view
> that, "Hey, as it comes along and as things kind of move in transition, it will grow?"
>
> [Defendant Saltzman]
>
> Well, we have no specific number forecast, if that's what you're looking for.  I
> mean, I think – look, there's lots of capital available in the market today, albeit I
> would say it's fairly selective and picky with respect to strategies and managers
> that people want to invest with.  So it's kind of good news/bad news, if you will,
> although I think we fall into the category of a preferred manager.   And
> simultaneously, I think we've done a great job of really selecting what are the
> appropriate strategies, consistent with all of things I reviewed earlier in the call,
> some of – all the things that we've been doing in the last 10 years, whether in single-
> family for rent or other spaces.  And so as a result, notwithstanding that the market

is picky and selective, we're quite confident and optimistic about getting at least our fair share, if not more than our fair share, of the market.

181. During the call, Defendant Tangen reported that Colony NorthStar had "pruned various other noncore assets within our industrial and healthcare verticals" and had "ended the quarter with a slightly smaller healthcare portfolio, 417 properties compared to 425 last quarter, as a result of our ongoing selective portfolio pruning."

182. During the call, Defendant Tangen further reported that the Company's:

Investment Management business ended the quarter with $41.7 billion of third-party assets under management, up from $40.3 billion at the end of the second quarter. The increase in AUM was driven primarily by the syndication of the equity in the downtown Los Angeles office building, the foreclosure and consolidation of the THL Hotel Portfolio and increased assets under management at Townsend, which is currently held for sale.

***November 9, 2017 Investor Presentation***

183. On November 9, 2017, the Company posted to its website an investor presentation discussing the state of the Company's retail capital fundraising. The presentation noted that a benefit of the Company being an investment manager was that "[g]rowing, stable fees generate [a] diversified income stream," and again stated a near-term priority in the investment management segment to "accelerate fundraising in new retail vehicles."

184. The statements in ¶¶ 126-145 and 151-183 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company's capital fundraising was not accelerating or gaining momentum; (2) the Company's funds would not be able to raise retail funds sufficient to contribute materially to the Company's financial results; (3) the Company was being negatively impacted by new regulations regarding the disclosure of investment management fees, and the effect it had on the collection of fees, to a greater extent than portrayed; (4) the Company's retail investment management business was not substantially contributing to the Company's target capital fundraising amount; (5) the Company would not meet its Core FFO and dividend guidance;

(6) the overall performance of Company, including specifically its Healthcare and Investment Management segments, was weaker than had been reported; and (7) the Company failed to maintain internal controls.

### The Truth Emerges

185.    On March 1, 2018 Colony NorthStar issued a press release titled "Colony NorthStar Announces Fourth Quarter and Full Year 2017 Financial Results." The press release, *inter alia*, reported:

- Fourth quarter 2017 net loss attributable to common stockholders of $(368.1) million, or $(0.69) per share, and full year 2017 net loss attributable to common stockholders of $(333.1) million, or $(0.64) per share, which included a $375 million write-down of goodwill and intangibles related to our retail investment management business
- Fourth quarter 2017 Core FFO of $95.1 million, or $0.16 per share, and FFO of $(295.5) million, or $(0.51) per share
- Declared and paid a fourth quarter 2017 dividend of $0.27 per share of Class A and B common stock, for an aggregate post-merger 2017 dividend of $1.05 per share, which was more than covered by our full year Core FFO and taxable income
- The Company's Board of Directors declared a first quarter 2018 cash dividend of $0.11 per share of Class A and Class B common stock targeting an annualized dividend of $0.44 per share to approximate estimated 2018 taxable income and net cash flow, excluding gains
- The Company's Board of Directors authorized a new $300 million common stock repurchase program

\* \* \*

**Fourth Quarter and Full Year 2017 Highlights**

- During the fourth quarter 2017, the Company completed $632 million of asset monetizations for an aggregate $4.9 billion of asset monetizations in 2017 furthering its goal to simplify its business and balance sheet

- The Company has exceeded, on a run-rate basis, its original annual synergies target of $115 million (which includes stock compensation savings) by approximately $35 million, or 30%, and its original annual cash synergies target of $80 million by approximately $15 million, or 20%

- During the fourth quarter 2017, the Company and its share of affiliates raised approximately $280 million of third-party capital from institutional clients and retail investors achieving its annual target of $2.0 billion for the full year 2017

- During the fourth quarter 2017, the Company and funds managed by the Company invested and agreed to invest $379 million comprised of $195 million and $184 million, respectively, and for the full year 2017, the Company and funds managed by the Company invested and agreed to invest $2.8 billion comprised of $1.8 billion and $1.0 billion, respectively

186.    In the press release, Defendant Saltzman stated, "2017 was, on balance, a disappointing year for Colony NorthStar . . . Our financial results were not as robust as anticipated."

187.    On the same day, the Company filed its annual report with the SEC announcing financial results for the quarter and year ended December 31, 2018, on Form 10-K (the "2017 10-K"). The 2017 10-K reported Core FFO of $1.16 per share for the 2017 fiscal year, far removed from the Company's $1.40 to $1.58 per share guidance reported during the Relevant Period.

188.    The 2017 10-K also announced that the Company had recorded a goodwill impairment of over $375 million in the Investment Management segment, and over $14 million in the Healthcare segment.

189.    The 2017 10-K stated, regarding the goodwill impairment in the Healthcare segment:

> *Healthcare*—Impairment loss of approximately $9.8 million was recorded on six properties that were sold or held for sale in 2017 based on their contracted sales prices, consisting of a medical office building, hospitals and skilled nursing facilities. Remaining impairment loss was incurred upon the conversion of three RIDEA properties into net lease arrangements as well as due to property damage resulting from hurricanes Harvey and Irma, net of insurance recoveries.

190.    The 2017 10-K stated, regarding the goodwill impairment in the Investment Management segment:

*Investment Management*—The impairment recognized in 2017 consisted of the following:

- $316.0 million write-down in goodwill, which represents the excess in carrying value of our investment management reporting unit, including its assigned goodwill, over its estimated fair value . . .; and

- write-down of management contract intangibles for non-traded REITs that were acquired through the Merger, specifically $55.3 million for Colony NorthStar Healthcare Income Inc. ("Colony NorthStar Healthcare") based on an amendment to its advisory agreement as part of our efforts to preserve liquidity in Colony NorthStar Healthcare and $3.7 million for Colony NorthStar/RXR NY Metro Real Estate Inc ("Colony NorthStar/RXR NY Metro") based on revised capital raising projections . . .

191.    The Company held a conference call with analysts and investors on the same day.

During the call, Defendant Saltzman stated, in relevant part:

On the other hand, our earnings performance has not lived up to expectations, emanating from more challenging industry conditions in healthcare real estate as well as our retail broker dealer distribution business . . .

* * *

Retail broker dealer distribution was another area of very disappointing results, the industry generally remained in enormous transition from major regulatory headwinds including the newly implemented fiduciary role as well as the change in product constructs, more conservative 40 Act and integral funds that operate with less leverage and offer more liquidity options.

Capital raising in 2017 from these channels totaled only $137 million, down from past levels of an excess of $1 billion per year.

* * *

Our business model is to fill in as much of the earnings GAAP as we can through Investment Management economics both recurring fees and profits interests.  But in 2017, we merely treaded water in that regard.

192.    Also during the call, Defendant Saltzman commented on the disappointing results

stemming from the Merger, stating, in relevant part:

The NorthStar merger, which closed a little over 1 year ago, has not produced the math tha[t] we anticipated when we completed the transaction.  It was a merger that

was supposed to be earnings neutral at worst.  And so far, it has proven to be earnings dilutive.  Furthermore, the merger integration has taken longer than expected.  We believe that we are largely at the end of that process, and we have much greater confidence around the go-forward anticipated results from the inherited NorthStar businesses that have been the primary source of our underperformance in 2017.

193.     The earnings call also confirmed that the Company was slashing its dividend from $1.08 per share in 2017 to $0.44 per share in 2018.

194.     Also during the call, Defendant Tangen commented on the goodwill impairment, stating, in relevant part:

A few material accounting items to mention during the fourth quarter that impacted our GAAP results, we recorded a goodwill impairment of $316 million to reflect the lower value in our investment management business primarily attributable to our retail broker dealer distribution business. And we also wrote down management agreement intangible assets by $35 million to reflect amendments to our management agreement in our healthcare non-treated REIT NHI, net of deferred tax impact.

195.     On this news, the price of Colony NorthStar shares fell more than 22.8%, or $1.78 per share, from the per share closing price on the previous day, closing at $6.00 per share on March 1, 2018.

**Repurchases**

196.     During the period in which the Company made false and misleading statements and/or omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company.

197.     As the Company stock was actually only worth $5.50 per share, the price at closing on March 23, 2018, the Company overpaid $171.5 million in total for these repurchases.

198.     According to the Company's Q1 2017 10-Q, in the month of March 2017, the Individual Defendants caused the Company to repurchase 4,933,337 shares of its own Class A

common stock at an average price per share of approximately $13.42, for a total cost to the Company of approximately $66.2 million.

199.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $7.92 more than the actual worth of each share during the month of March 2017. Thus, the total over payment by the Company for its repurchases of its own stock during March 2017 was approximately $39.1 million.

200.     According to the Company's Q2 2017 10-Q, in the month of April 2017, the Individual Defendants caused the Company to repurchase 8,000,000 shares of its own Class A common stock at an average price per share of approximately $12.72, for a total cost to the Company of approximately $101.8 million.

201.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $7.22 more than the actual worth of each share during April 2017. Thus, the total over payment by the Company for its repurchases of its own stock during April 2017 was approximately $57.8 million.

202.     According to the Company's Q3 2017 10-Q, in the quarter ended September 30, 2017, the Individual Defendants caused the Company to repurchase 4,362,577 shares of its own Class A common stock at an average price per share of approximately $12.98, for a total cost to the Company of approximately $56.6 million.

203.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $7.48 more than the actual worth of each share during the quarter ended September 30,

2017. Thus, the total over payment by the Company for its repurchases of its own stock during the quarter ended September 30, 2017 was approximately $32.6 million.

204.    According to the Company's 2017 10-K, in the quarter ended December 31, 2017, the Individual Defendants caused the Company to repurchase 6,075,157 shares of its own Class A common stock at an average price per share of approximately $12.43, for a total cost to the Company of approximately $75.5 million.

205.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $6.93 more than the actual worth of each share during the quarter ended December 31, 2017. Thus, the total over payment by the Company for its repurchases of its own stock during the quarter ended December 31, 2017 was approximately $42.1 million.

206.    In total, the Company overpaid an aggregate amount of approximately $171.5 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

### Summary of Individual Defendants' Misconduct

207.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

208.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the foregoing false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

209.    Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, the Individual Defendants breached their fiduciary duties by causing the

Company to overpay for repurchases of Company stock, and three of the Individual Defendants benefitted themselves by engaging in insider sales.

210.    The Individual Defendants moreover breached their fiduciary duties by causing the Company to fail to maintain internal controls.

## DAMAGES TO NORTHSTAR

211.    As a direct and proximate result of the Individual Defendants' conduct, Colony NorthStar is losing and expending, and will lose and expend, many millions of dollars.

212.    Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Action filed against the Company and four of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

213.    Such losses include the Company's overpayment by approximately $171.5 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

214.    Such costs include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

215.    As a direct and proximate result of the Individual Defendants' conduct, Colony NorthStar has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

216.    As the damages to the Company are in the millions, the amount sought in this action exceeds $75,000 dollars.

## DERIVATIVE ALLEGATIONS

217.    Plaintiff brings this action derivatively and for the benefit of Colony NorthStar to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Colony NorthStar, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act as well as the aiding and abetting thereof.

218.    Colony NorthStar is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

219.    Plaintiff is, and has been at all relevant times, a Colony NorthStar shareholder. Plaintiff will adequately and fairly represent the interests of Colony NorthStar in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

220.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

221.    A pre-suit demand on the Board of Colony NorthStar is futile and, therefore, excused. At the time of filing of this action, the Board consists of nine individuals: Individual Defendants Barrack, Crocker, Fosheim, Metz, Parker, Schoenherr, Steffens, and Somers (the "Directors"), and non-party Curtin (together with the Director-Defendants, the "Directors"). Plaintiff only needs to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

222.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make the false and

misleading statements and omissions of material fact and causing the Company to overpay $171.5 million for repurchases of its own stock while certain of the Individual Defendants engaged in lucrative insider sales of Company stock, which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

223.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly made and/or caused the Company to make the materially false and misleading statements alleged herein and caused the Company to overpay $171.5 million for repurchases of its own stock while certain of the Individual Defendants engaged in lucrative insider sales of Company stock. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors.

224.    As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

225.    Additional reasons that demand on Defendant Barrack is futile follow. Defendant Barrack is the Executive Chairman of the Board, a position he has occupied since the Merger, and is thus, as the Company admits, a non-independent director. Indeed, the Company compensated him with over $3.4 million in the 2017 fiscal year. Defendant Barrack was ultimately responsible for the false and misleading statements and omissions that were made, including those contained in the 2016 10-K, which he signed and thus personally made. Moreover, Defendant Barrack conducted little, if any, oversight of the Company's internal controls and of the scheme to make false and misleading statements and caused the Company to overpay $171.5 million for repurchases of its own stock while certain of the Individual Defendants engaged in lucrative insider

sales of Company stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Barrack's daughter is employed by the Company, and has been since 2000. As Defendant Barrack may fear retaliation against her, and himself, should he grant a demand, he is not able to evaluate a demand with independence. Employees of the Company provide services to Defendant Barrack's family business, for which he reimbursed the Company $800,000 in the year ended December 31, 2017. This arrangement may be jeopardized should he grant a demand, impinging Defendant Barrack's ability to evaluate a demand with independence. For these reasons, too, Defendant Barrack breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

226.    Additional reasons that demand on Defendant Parker is futile follow. Defendant Parker has served as a Company director since the Merger and is the Chair of the Audit Committee. He receives lavish compensation, including $328,006 in the 2017 fiscal year. As a Company director and Chair of the Audit Committee, Defendant Parker conducted little, if any, oversight of the Company's internal controls and of the scheme to make false and misleading statements and cause the Company to overpay $171.5 million for repurchases of its own stock while certain of the Individual Defendants engaged in lucrative insider sales of Company stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made the false and misleading statements in, the 2016 10-K that is referenced herein. For these reasons, too, Defendant Parker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

227.    Additional reasons that demand on Defendant Schoenherr is futile follow. Defendant Schoenherr has served as a Company director since the Merger and is a member of the Audit Committee. He receives lavish compensation, including $308,506 in the 2017 fiscal year. As a Company director and member of the Audit Committee, Defendant Schoenherr conducted little, if any, oversight of the Company's internal controls and of the scheme to make false and misleading statements and cause the Company to overpay $171.5 million for repurchases of its own stock while certain of the Individual Defendants engaged in lucrative insider sales of Company stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made the false and misleading statements in, the 2016 10-K that is referenced herein. For these reasons, too, Defendant Schoenherr breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

228.    Additional reasons that demand on Defendant Fosheim is futile follow. Defendant Fosheim has served as a Company director since the Merger and is a member of the Audit Committee. He receives lavish compensation, including $323,131 in the 2017 fiscal year. As a Company director and member of the Audit Committee, Defendant Fosheim conducted little, if any, oversight of the Company's internal controls and of the scheme to make false and misleading statements and cause the Company to overpay $171.5 million for repurchases of its own stock while certain of the Individual Defendants engaged in lucrative insider sales of Company stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made the false and misleading statements in, the 2016 10-K that is referenced

herein. For these reasons, too, Defendant Fosheim breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

229.    Additional reasons that demand on Defendant Crocker is futile follow. Defendant Crocker has served as a Company director since the Merger and is a member of the Audit Committee. He receives lavish compensation, including $308,506 in the 2017 fiscal year. As a Company director and member of the Audit Committee, Defendant Crocker conducted little, if any, oversight of the Company's internal controls and of the scheme to make false and misleading statements and cause the Company to overpay $171.5 million for repurchases of its own stock while certain of the Individual Defendants engaged in lucrative insider sales of Company stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made the false and misleading statements in, the 2016 10-K that is referenced herein. For these reasons, too, Defendant Crocker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

230.    Additional reasons that demand on Defendant Steffens is futile follow. Defendant Steffens has served as a director since the Merger. Prior to the Merger, he was a long-time director at Colony Capital. Defendant Steffens receives lavish compensation, including $323,131 in the 2017 fiscal year. As a Company director, Defendant Steffens conducted little, if any, oversight of the Company's internal controls and of the scheme to make false and misleading statements and cause the Company to overpay $171.5 million for repurchases of its own stock while certain of the Individual Defendants engaged in lucrative insider sales of Company stock, consciously

disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Steffens signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Steffens breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

231.    Additional reasons that demand on Defendant Somers is futile follow. Defendant Somers has served as a director since the Merger. Prior to the Merger, he was a long-time director at Colony Capital. Defendant Somers receives lavish compensation, including $323,131 in the 2017 fiscal year. As a Company director, Defendant Somers conducted little, if any, oversight of the Company's internal controls and of the scheme to make false and misleading statements and cause the Company to overpay $171.5 million for repurchases of its own stock while certain of the Individual Defendants engaged in lucrative insider sales of Company stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Somers signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Somers breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

232.    Additional reasons that demand on Defendant Metz is futile follow. Defendant Metz has served as a Company director since the Merger. He receives lavish compensation, including $323,131 in the 2017 fiscal year. As a Company director, Defendant Metz conducted little, if any, oversight of the Company's internal controls and of the scheme to make false and misleading statements and cause the Company to overpay $171.5 million for repurchases of its own stock while certain of the Individual Defendants engaged in lucrative insider sales of

Company stock, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made the false and misleading statements in, the 2016 10-K that is referenced herein. For these reasons, too, Defendant Metz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

233.    Additional reasons that demand on the Board is futile follow.

234.    Each one of the Directors, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by $171.5 million for its own common stock during the period in which the false and misleading statements were made. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

235.    Many of the Individual Defendants, including, but not limited to, the Directors, have strong social and professional ties because of their associations with the Predecessor Entities, as follows:

•    At Colony Capital, Defendant Barrack was Executive Chairman and founder, Defendant Saltzman was President, CEO and member of the board, Defendant Redington was the CAO and Managing Director and Defendant Tangen was the CFO and executive director. Defendants Somers, Steffens and Parker were long-time Colony Capital

directors, serving from 2009 until the Merger in 2017, and Curtin was a director of Colony Capital from 2014 to 2017.

- Defendant Hamamoto co-founded the predecessor of NRF. At NRF, Defendant Hamamoto was the chairman of the board from 2007 to 2017, CEO from 2004 to 2015 and President from 2004 to 2011. Defendant Hamamoto was also the Chairman of Colony NorthStar Real Estate Income Trust from 2009 to 2015, and its CEO from 2009 to 2013. Defendant Hamamoto was the Chairman of Colony NorthStar Real Estate Income II from 2012 to 2015. Defendant Schoenherr was an independent director of NRF, Colony NorthStar Real Estate Income Trust, and Colony NorthStar Real Estate Income II from 2014 to 2017, 2010 to 2015 and 2012 to2017, respectively.[12]

- Defendant Hamamoto was the Executive Chairman of NSAM from 2015 until the Merger and was its CEO from January 2014 to August 2015. Defendant Metz was an independent director of NSAM from 2014 to 2017.

- Defendant Hamamoto was the Chairman of the board of Colony NorthStar Realty Europe, which is externally managed by Colony NorthStar, from 2015 to January 11, 2018. Defendant Schoenherr served on the board of Colony NorthStar Realty Europe from 2015 to 2017, and Defendant Saltzman has been a director since 2017.

As Defendants Tangen, Saltzman, Redington, and Hamamoto each face a substantial likelihood of liability in the Securities Class Action, the personal and professional associations that Directors Barrack, Somers, Steffens, Parker, Schoenherr and Metz have with those Individual Defendants

---

[12] Colony NorthStar Real Estate Income Trust and Colony NorthStar Real Estate Income II were merged with an into Colony NorthStar Credit Real Estate Inc. on January 31, 2018.  On June 25, 2018, Colony NorthStar Credit Real Estate Inc. changed its name to Colony Credit Real Estate, Inc.

due to their shared service at Predecessor Entities prevent Defendants Barrack, Somers, Steffens, Parker, Schoenherr and Metz from evaluating a demand with disinterestedness or independence.

236.     According to the 2018 Proxy Statement, Colony NorthStar conducts "substantially all of [its] activities and hold[s] substantially all of [its] assets and liabilities through Colony Capital Operating Company, LLC" (the "Operating Company"). Defendant Barrack is a director and Executive Chairman of the Operating Company, Defendant Saltzman is its CEO and President, Defendant Redington its CAO, and Defendant Hamamoto was Executive Vice Chairman and director until January 11, 2018. Defendants Crocker, Curtin, Fosheim, Parker, Somers, Steffens, Schoenherr, and Metz are all directors of the Operating Company. The professional associations that the Directors have developed through their service to the Operating Company, combined with the substantial likelihood of liability faced by Defendants Saltzman, Hamamoto, and Tangen in the Securities Class Action prevent the Directors from evaluating a demand with disinterestedness or independence.

237.     Social and professional connections between the Directors are not limited to entities associated with Colony NorthStar. For example, Defendants Croker and Fosheim both previously served together on the board of Associated Estates Realty Corporation, another REIT, prior to its sale to Brookfield Asset Management Inc. This network of social connections prevents the Directors from evaluating a demand with independence, and thus, demand is excused.

238.     Prior to becoming a director of Colony NorthStar, Defendant Steffens spent 38 years at Merrill Lynch, including in senior executive roles. Defendant Saltzman also served in senior executive roles at Merrill Lynch from 1982 until he joined Colony Capital in 2003. Defendants Saltzman and Steffens' tenures at Merrill Lynch overlapped by decades, including the period between 1986 and 2001 when Defendant Steffens served as a Director of Merrill Lynch.

As a result of the social and professional connections which, upon information and belief, Defendants Saltzman and Steffens developed at Merrill Lynch, and in light of the substantial likelihood of liability that Defendant Saltzman faces in the Securities Class Action, Defendant Steffens is unable to evaluate a demand with independence.

239.    Colony NorthStar has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Colony NorthStar any part of the damages Colony NorthStar suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

240.    The Individual Defendants' conduct described herein and summarized above, including the decision for the Company to engage in the repurchases of its own stock, could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, such Directors are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

241.    The acts complained of herein constitute violations of fiduciary duties owed by Colony NorthStar's officers and directors, and these acts are incapable of ratification.

242.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e.,

monies belonging to the stockholders of Colony NorthStar. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Colony NorthStar, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

243.    If there is no directors' and officers' liability insurance, then the Directors will not cause Colony NorthStar to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

244.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

245.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

246.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not

sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

247.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

248.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

249.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company's capital fundraising was not accelerating or gaining momentum; (2) the Company's funds would not be able to raise retail funds sufficient to contribute materially to the Company's financial results; (3) the Company was being negatively impacted by new regulations regarding the disclosure of investment management fees, and the effect it had on the collection of fees, to a greater extent than portrayed; (4) the Company's retail investment management business was not substantially contributing to the Company's target capital fundraising amount; (5) the Company would not meet its Core FFO and dividend guidance; (6)

the overall performance of Company, including specifically its Healthcare and Investment Management segments, was weaker than had been reported; and (7) the Company failed to maintain internal controls.

250.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

251.    The 2017 Proxy Statement also made reference to the Company's Code of Ethics. The Code of Ethics required the Company and Individual Defendants to abide by relevant laws and statutes, make accurate and non-misleading public disclosures, and not engage in insider trading. By issuing false and misleading statements to the investing public, and insider trading, the Individual Defendants violated the Code of Ethics. The 2017 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Ethics were being violated.

252.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

253.     The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Barrack, Hamamoto, Crocker, Fosheim, Metz, Parker, Schoenherr, Somers, and Steffens, which allowed them to continue breaching their fiduciary duties to Colony NorthStar.

254.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

255.     Plaintiff on behalf of Colony NorthStar has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

256.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

257.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Colony NorthStar. Not only is Colony NorthStar now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Colony NorthStar by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase billions of dollars of its own shares on the open market at artificially-inflated prices, damaging Colony NorthStar.

258.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

259.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Colony NorthStar not misleading.

260.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Colony NorthStar. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

261.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and/or signed the Company's Form 10-Ks and 10-Qs filed with the SEC during the Relevant Period.

262.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

263.     Plaintiff on behalf of Colony NorthStar has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

264.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

265.     The Individual Defendants, by virtue of their positions with Colony NorthStar and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Colony NorthStar and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20 (a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Colony NorthStar to engage in the illegal conduct and practices complained of herein.

266.     Plaintiff on behalf of Colony NorthStar has no adequate remedy at law.

## FOURTH CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

267.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Colony NorthStar's business and affairs.

269.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

270.     The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.

The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Colony NorthStar.

271.    The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

272.    In further breach of their fiduciary duties owed to Colony NorthStar, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact. Specifically, Defendants failed to disclose, *inter alia*, that: (1) the Company's capital fundraising was not accelerating or gaining momentum; (2) the Company's funds would not be able to raise retail funds sufficient to contribute materially to the Company's financial results; (3) the Company was being negatively impacted by new regulations regarding the disclosure of investment management fees, and the effect it had on the collection of fees, to a greater extent than portrayed; (4) the Company's retail investment management business was not substantially contributing to the Company's target capital fundraising amount; (5) the Company would not meet its Core FFO and dividend guidance; (6) the overall performance of Company, including specifically its Healthcare and Investment Management segments, was weaker than had been reported; and (7) the Company failed to maintain internal controls.

273.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

274.    In breach of their fiduciary duties, three of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach

of their fiduciary duties, caused the Company to engage in repurchasing its own stock at artificially inflated prices.

275.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Colony NorthStar's securities and disguising insider sales.

276.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Colony NorthStar's securities and engaging in insider sales.

277.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

278.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Colony NorthStar has sustained and continues to sustain significant

damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

279.    Plaintiff, on behalf of Colony NorthStar, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

280.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

281.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Colony NorthStar.

282.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Colony NorthStar that was tied to the performance or artificially inflated valuation of Colony NorthStar, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

283.    Plaintiff, as a shareholder and a representative of Colony NorthStar, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation (including any performance-based or valuation-based compensation)—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

284.    Plaintiff, on behalf of Colony NorthStar, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

285.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

286.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Colony NorthStar, for which they are legally responsible.

287.     As a direct and proximate result of the Individual Defendants' abuse of control, Colony NorthStar has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Colony NorthStar has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

288.     Plaintiff, on behalf of Colony NorthStar, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

289.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

290.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Colony NorthStar in a manner consistent with the operations of a publicly-held corporation.

291.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Colony NorthStar has sustained and will continue to sustain significant damages.

292.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

293.    Plaintiff, on behalf of Colony NorthStar, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

294.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

295.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

296.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Colony NorthStar to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

297.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

298.    Plaintiff, on behalf of Colony NorthStar, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all of the Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Colony NorthStar, and that Plaintiff is an adequate representative of the Company;

(b)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Colony NorthStar;

(c)      Determining and awarding to Colony NorthStar the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Colony NorthStar and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Colony NorthStar and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Colony NorthStar to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Colony NorthStar restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 16, 2019

Respectfully submitted,

MURPHY, FALCON & MURPHY

*/w/ permission/*

William H. Murphy III (30126)

OF COUNSEL:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

Nikoletta S. Mendrinos (18961)
One South Street, 23rd Floor
Baltimore, Maryland 21202
Telephone: (410) 539-6500
Facsimile: (410) 539-6599
Email: hassan.murphy@murphyfalcon.com
        nikoletta.mendrinos@murphyfalcon.com